**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOANN MATOS,<br><br>Plaintiff,<br><br>v.<br><br>WATERCO OF THE CENTRAL STATE, INC. D/B/A/ CULLIGAN WATER, WATERCO OF NEW ENGLAND, INC., & CULLIGAN BY WATERCO,<br><br>Defendants. | CIVIL ACTION NO:<br><br>DECEMBER 10, 2025<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, JoAnn Matos (hereinafter, "Plaintiff"), by and through the undersigned counsel, Carey & Associates, P.C., files this Complaint against the Defendants, WaterCo of the Central States, Inc., d/b/a Culligan Water (hereinafter, "Culligan"), Waterco of New England, Inc., and Culligan by Waterco (hereinafter, the "Defendants"). Plaintiff alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff's Complaint asserts claims for: (1) discrimination based on age in violation of Age Discrimination in Employment Act (hereinafter, "ADEA"); (2) discrimination based on age in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) (hereinafter, "CFEPA"); (3) discrimination based on sex in violation of Title VII; (4) discrimination based on age in violation of the CFEPA; (5) discrimination based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., (hereafter, "ADA"); (6) discrimination based on disability in violation of the CFEPA; (7) discrimination based on disability in violation of the ADA for failure to

accommodate; (8) discrimination based on disability in violation of the CFEPA for failure to accommodate; (9) discrimination based on race pursuant to 42 U.S.C. § 1981; (10) discrimination based on race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1) (hereinafter, "Title VII"); (11) discrimination based on race in violation of CFEPA; (12) retaliation discrimination in violation of the ADEA; (13) retaliation discrimination in violation of the ADA; (14) retaliation discrimination in violation of the Title VII; (15) retaliation discrimination in violation of 42 U.S.C. § 1981; (16) retaliation discrimination in violation of the CFEPA; (17) fraudulent misrepresentation and inducement; and (18) intentional infliction of emotional distress.

## PARTIES

2. Plaintiff, JoAnn Matos, is a resident of the State of Connecticut. Most of Plaintiff's work for the Defendants was performed in Connecticut.

3. Defendant Culligan is a domestic company with its principal place of business in Danbury, Connecticut. At all times relevant to this Complaint, Defendant conducted business within the jurisdiction of this Court.

4. Defendant Waterco of New England, Inc. is a domestic company with its principal place of business in Danbury, Connecticut. At all times relevant to this Complaint, Defendant conducted business within the jurisdiction of this Court.

5. Defendant Culligan by Waterco is a domestic company with its principal place of business in Danbury, Connecticut. At all times relevant to this Complaint, Defendant conducted business within the jurisdiction of this Court.

**PROCEDURAL PREREQUISITES**

6. On March 4, 2025, Plaintiff filed a "dual charge" of discrimination against Defendants with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC").

7. On September 23, 2025, the EEOC sent a Notice of Right to Sue letter regarding Charge No. 16A-2025-00787to the Plaintiff (Exhibit "A").

8. On September 16, 2025, the CHRO sent a Release of Jurisdiction regarding CHRO 2520345 to the Plaintiff (Exhibit "B").

9. Plaintiff exhausted all administrative remedies with respect to her claims concerning discrimination because of her disability under both Federal and Connecticut law.

**JURISDICTION AND VENUE**

10. Plaintiff's claims pursuant to the ADEA, ADA, Title VII, and 42 U.S.C. § 1981 raise questions of federal law.

11. This Court has jurisdiction over the ADEA, ADA, Title VII, and 42 U.S.C. § 1981 claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's remaining claims, including those under the CFEPA, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

12. The District of Connecticut is the appropriate venue for this matter pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut.

**FACTUAL ALLEGATIONS**

13. Plaintiff currently resides in New Milford, Connecticut and works for the Respondent, WaterCo of the Central States, Inc., d/b/a Culligan Water at 28 Eagle Road, Danbury,

Connecticut as listed on her 2024 W2. The corporate headquarters is located in Lombard, Illinois. Plaintiff's offer letter lists Culligan by WaterCo as her employer. On her 2022 and 2023 W2s, her employer was listed as Waterco of New England, Inc. with an address of 1910 S. Highland Avenue, Suite 360, Lombard, Illinois 60148.

14. Plaintiff is now 63 years old and her date of birth is XX XX XXXX.

15. On November 28, 2022, Plaintiff began working at WaterCo of the Central States, Inc., d/b/a Culligan Water ("Culligan" or "Company") as a Customer Service Representative. Plaintiff started the position with a base salary of $20.00 an hour, $2,000.00 sign on bonus, and commission for sales and performance bonuses.

16. Respondent is a corporation, with a business address of 28 Eagle Rd, c/o Wendy Osborne Regional Manager, of Danbury, Connecticut, 06810.

17. On January 3, 2025 and January 13, 2025, Plaintiff suffered two severe panic attacks due to the relentless aggression, and discrimination based on her age (62), sex (female), and race (Hispanic/Puerto Rican), and retaliation against her by Culligan, particularly general manager, Shawn McDowell and office manager, Danielle Nolan (both Caucasian and younger).

18. The discrimination against Plaintiff started her first day, on November 28, 2022, as she discovered that the Sales Coordinator position Plaintiff had interviewed for in November 2022, was given to Julia Vasquez (19 years old) who had worked for Culligan since she was 18 as a CSR but only had one year of experience. Plaintiff was more qualified for this position and Plaintiff was not hired for it.

19. General Manager, Shawn McDowell's age, sex, and racial discrimination and retaliation against Plaintiff has been ongoing since she disclosed her age to him in or about

December 2022. Danielle Nolan, office manager, assists Mr. McDowell and carries out acts of retaliation along with him, targeting Plaintiff and she carries out unfair, cruel mistreatment and deliberately told other staff to avoid Plaintiff and not to speak to her. Thus, they have both worked together in retaliating against Plaintiff first when they realized her age was too old for Culligan and retaliated against her for reporting discrimination and unfair treatment of Plaintiff by three managers, Shawn McDowell, Danielle Nolan, and Jim Nolan.

20. In Plaintiff's first year between January 2023 to July 2023, managers, Mr. McDowell and Ms. Nolan have made many false accusations against her. Plaintiff has been blamed for other employees' and managers' mistakes that Plaintiff had nothing to do with. They both retaliated against Plaintiff with administrative actions, denying her equal training and equal opportunities, and commission. Plaintiff is the only employee that is treated like this.

21. For the entirety of Plaintiff's career, she has worked in a corporate and hospital office setting. Plaintiff graduated from Katharine Gibbs College in Norwalk, Connecticut and attended Western CT State University. Plaintiff has worked for the Chief of Cardiology at Danbury Hospital for 10 years and single-handedly became cross trained and well-versed to cover all branches of the department at a moment's call out. Plaintiff was utilized in the ER and critical care units to translate critical lifesaving information to Spanish and Portuguese patients with severe heart conditions or critical medical situations. Plaintiff assisted in the Cardiac Cath Lab during procedures and throughout the Stress testing areas assisting non-English speaking patients. Physicians insisted on waiting for Plaintiff

to become available to translate as the information was critical and vital to be translated accurately.

22. Plaintiff's career started working for large corporations, such as Boehringer Ingelheim Pharmaceuticals, GE Capital Aviation Sales Department, New Milford Hospital, the Regional YMCA as Office Manager, Comnet Communications, IMS Corporation, Shock Electrical Contractors, and several others where her skills were utilized as a professional administrative office support staff managing clients, meetings, and taking corporate meeting minutes. Plaintiff has never been paid for translating. Plaintiff volunteers that skill because she offers that valuable skill as an advantage to the employer hiring her and to its customers to provide equal opportunity to goods and services. Plaintiff has 37 years of marketing, sales, administrative management, travel preparation; tracking expense accounts for executives, preparation of excel spreadsheets, Human Resource scouting, hiring and managing employee benefits and payroll. Plaintiff has many recommendation letters that Plaintiff used to interview with Culligan. Plaintiff utilized her previous employers as references for any job she applied for and they are happy to help her.

23. In November 2022, Plaintiff first applied and interviewed for a Sales Coordinator position in sales at Culligan. Plaintiff did not get that position. This job was given to a younger and less experienced 19 year old Customer Service Representative ("CSR") as discussed herein.

24. When Plaintiff was contacted by Danielle Nolan, she mentioned that her resume came to her via an interview Plaintiff had with Jon Broz, Regional Sales Manager, who manages the Sales Coordinator position Plaintiff applied for. This is a male dominated department. Only one female in the two years has worked at in the Sales Department at Culligan and

she did not last 6 months. Jon Broz sent Plaintiff's resume to Danielle Nolan telling her that she should consider hiring this person that he interviewed because he was extremely impressed with her qualifications and how Plaintiff interviewed for the position.

25. Ms. Nolan called Plaintiff on her cell phone several days after her interview with Jon Broz to say that Plaintiff "did not get the position in Sales, but Jon Broz gave such a stellar recommendation of you that I am calling to let you know we have another position." Plaintiff said, "I am not looking to work in Customer Service." Plaintiff's resume depicts the Administrative roles that she successfully filled and her expertise is in Sales. Ms. Nolan told Plaintiff she was so impressed with her resume, and that Plaintiff came so highly recommended by one of our Regional Sales Managers, that she wanted to consider Plaintiff for the position as a CSR. Plaintiff told Ms. Nolan she would prefer to meet in person because Plaintiff believed she would certainly be the professional image they were looking for.

26. **Misrepresentation:** On or about November 8, 2022, Plaintiff met both Ms. Nolan and Mr. McDowell, who were not dressed professionally, at Culligan. Plaintiff was professionally dressed. Plaintiff noticed right away that the office was extremely dirty and dank looking. Plaintiff met with them for an hour and Plaintiff impressed them with her professionalism and her work experience. Plaintiff assured both managers during this interview that she would consider working as a CSR but that Plaintiff did not want to work with high volume telephone calls. They assured her that there was managerial support for dealing with customers on the phones. They assured Plaintiff that she would have full access to their offices close by and Plaintiff could walk in any time for assistance. The interview went very well and they were obviously impressed by Plaintiff.

**<u>Plaintiff asked the two managers directly if they practiced favoritism or bias in the office. Both, with eagerness to have her work for Culligan, praised their office environment and made it clear, "we do not practice favoritism or bias." Plaintiff made it clear that she did not want to work anywhere where bias was allowed.</u>**

27. As mentioned above, Plaintiff worked directly for high ranking Corporate Senior VP and Hospital Administrators. Plaintiff did not expect the Culligan office to be so dirty. The walls were stained and unpainted. Plaintiff came from corporate offices that provided proper clean work areas, painting, and an overall professional appearance for customers walking in. The refrigerator was the most unsanitary and filthy, unsafe environment for employees to put their food. The office was severely run down. When Plaintiff left, she walked to her car and did not make it down the street before Ms. Nolan called her and said, "you had already impressed Jon Broz and now you have impressed all three managers" and she offered Plaintiff the position. Plaintiff did pause and think as she was caught off guard because Plaintiff had just left. However, Plaintiff accepted the offer and her start date was November 28, 2022.

28. **<u>Age Discrimination</u>:** Plaintiff also interviewed for Mitchell Fuel Oil for a Sales position at the same time that she interviewed at Culligan. Plaintiff decided to accept Culligan's offer because they offered a $2,000 sign-on bonus and the hours fit her schedule better. Plaintiff did go for a second interview with Mitchell Fuel after 2 weeks of working at Culligan. The two managers, Ms. Nolan and Mr. McDowell, clearly breached their verbal confirmation to Plaintiff about the preferential bias that they routinely practiced at Culligan in Danbury. After 2 weeks, Plaintiff was completely ignored and pushed aside by all three managers, as discussed herein. Plaintiff was not getting the same training or

equal treatment that Kayla Jesser (younger) was getting. Thus, Plaintiff decided to meet with Mitchell Fuel for a second interview. Unfortunately, they could not match the $2,000 sign-on bonus and the hourly pay was only $20.00. Despite the unfair treatment at Culligan, Plaintiff stayed but she also began to look for work online during her lunch hour in hopes of finding work elsewhere. It is now clear that the office had been toxic for many years prior to Plaintiff's hire. It was something Plaintiff was not only the next victim of but also it was made clear that the bias and ageism against only older women is a pre-existing pattern of Shawn McDowell and Danielle and Jim Nolan.

29. **Age Discrimination:** When Plaintiff interviewed for the Sales Coordinator position on or about November 4, 2022, she was informed that it was given to Julia Vasquez (19 years old) who had worked for Culligan since she was 18 as a CSR but only had one year of experience. Plaintiff was more qualified for this position and she was not hired for it. Plaintiff went on two interviews. Plaintiff interviewed with Jon Broz, Regional Sales Manager. Plaintiff came highly recommended by Jon Broz to Ms. Nolan who informed Plaintiff that the position was given to an employee that worked at Culligan. After she started working, Plaintiff asked Ms. Vasquez how long she worked there, and she told Plaintiff she only worked 1 year as a CRS. In comparison, Plaintiff's resume shows 37 years of corporate and medical professional experience, including sales and marketing experience as well as a proven track record. Yet, the job was given to the younger, less experienced 19 year old. The general manager and office manager are biased toward advancing younger females at Culligan while suppressing older females.

30. After Plaintiff reported to work on November 28, 2022, neither manager (Ms. Nolan and Mr. McDowell) spent very much time with her during the first week of her employment

other than to place her in the hands of 19 year old Julia Vasquez for training. When Mr. McDowell was in the office during Plaintiff's first week, he mostly stopped by Ms. Vasquez's desk to make a comment or joke during Plaintiff's training. He likes to walk around and make his presence known by making "jokes" or seeing why you are not at your desk. He creeps around the office a lot. He looked for Plaintiff every time he walked by her cubicle and she wasn't at her desk.

31. Plaintiff would later discover that Kayla Jesser, a 27 year old Caucasian female, was also hired as a CSR a week prior to Plaintiff.

32. **Age Discrimination:** On December 2, 2022, Mr. McDowell was walking past the kitchen and then stopped when he saw Plaintiff at the door alone. He stopped suddenly, he even seemed to be looking for Plaintiff because she was not in Ms. Vasquez's office. Plaintiff went to get a coffee and he waited until she was alone in the employee kitchen to ask her a question as he knew he had to be alone to ask it. He directly asked Plaintiff her age. **He said, "I shouldn't be asking you this, but, how old are you?"** He was nervous anyone would walk in at first. Plaintiff felt like she had no choice but to tell him the truth. **When Plaintiff told him that she was 60 years old, he was dumbfounded and shook his head in disbelief**. Plaintiff can only describe the expression on his face as "jaw dropped." Mr. McDowell obviously thought Plaintiff was much younger and was floored that Plaintiff was "*that* old" per his subsequent comments.

33. Of note, by Plaintiff's own physician's comments, Dr. Richard Rubin of Physicians for Women, every time she visit him, he thinks there is an error in her medical file because he says, "I had to look twice at the file, I told my office there is a mistake, and this

woman looks like she is 40 years old." Dr. Rubin is also one of Plaintiff's esteemed customers at Culligan for 2 years.

34. The only thing Mr. McDowell could mutter in response was, "ugh, (sound of disgust or of being fooled) well... (pausing at a loss for words) Congratulations." Plaintiff is accustomed to a person being shocked at her real age, it does happen often as Plaintiff is told she looks 20 years younger than her real age (as stated above) but when he said, "Congratulations." Plaintiff was confused. Plaintiff asked, "Congratulations for what?" Mr. McDowell awkwardly responded. "You don't look 60 years old. I would've never have thought you were *that* OLD. Wow…" Plaintiff thought that was inappropriate and insulting because he considered "60" as old. His expression of shock and disappointment was extremely clear to Plaintiff. He was shocked because he believed Plaintiff was much younger when Ms. Nolan hired her.

35. Plaintiff's age does not affect her ability to work and perform at a corporate professional level. In complete shock Mr. McDowell repeated, "I cannot believe it." Not knowing why this was such a big deal, Plaintiff responded, "well I am that old." Then, he looked Plaintiff up and down and said in a sexual tone "Well, you look *really* good for your age. You don't look 60." The conversation was uncomfortable with the way he looked Plaintiff up and down and made her feel like he was suddenly coming on to her almost to make up for his obvious disappointment that they hired Plaintiff not knowing she was "*that* old." Plaintiff just went back to her desk to escape the awkwardness of that confrontation.

36. Then, that same day, Mr. McDowell marched to Ms. Nolan's office and told everyone on his way there Plaintiff's age. <u>**He thought Ms. Nolan hired a much younger person**</u>. He

walked around the office and asked everyone in the office including managers, "can you believe that JoAnn is 60 years old?" Mr. McDowell also told the service department Manager Jim Nolan (Danielle Nolan's husband), Fabian Roman (to be discussed later), and anyone who would listen. Because of this, everyone was commenting to Plaintiff about her age including Sue Cole, she was also 60 years old. Plaintiff heard many commenting to each other, "can you believe it, no way... she looks so much younger."

37. **Age Discrimination:** After Plaintiff told Mr. McDowell, her age was office news. Plaintiff's cubical was only a few feet away from Ms. Nolan's office when Plaintiff heard Mr. McDowell asking her, "Did you know JoAnn is 60 years old?" Plaintiff wasn't sure why it made any difference how old she was. From that point on Mr. McDowell's and Ms. Nolan's attitudes toward Plaintiff had changed completely from the "very impressed" managers when they hired her to disappointment and regret for hiring someone "that old." Plaintiff do not believe Mr. McDowell had the right to announce to other staff how old she was.

38. **Age Discrimination:** For the first 8 months, December 2022 to August 2023, Plaintiff would be ignored by the managers, denied proper training, avoided by staff, treated poorly by everyone on the office and discriminated against, because Plaintiff told Mr. McDowell her age.

39. **Age Discrimination:** Plaintiff received only four days of training leaning over another employee's shoulder, Julia Vasquez, and Plaintiff as never given any other information about the Company, Company benefits, how to sell products and get commission, or which products and contracts were commission based. Plaintiff witnessed the other CSR new hire, Kayla Jesser (27 year old Caucasian) receive exceptional training and

motivational support by the same managers that mistreated her because of her age. Plaintiff was new to Culligan also yet Plaintiff listened to Ms. Jesser being trained individually at her desk with information that Plaintiff was not given, the same information Plaintiff needed to perform the same duties of a CSR. Plaintiff listened through the cubical divider and had to quickly write down "crib notes" of the important scheduling tricks they were spoon feeding to Ms. Jesser to perform shortcuts that made the program a breeze to use while Plaintiff had to eaves drop and take notes in an effort to learn what Ms. Jesser learned. They did not come around to Plaintiff's desk and give her the same training. Plaintiff repeatedly asked them to, "Please, I need that information also, can you share the information with me also so that I can be productive here?" Plaintiff could not figure out why she was being ignored continually. Plaintiff also could not figure out why the managers or staff would not say hello to her or come to her cubicle. Plaintiff did notice the managers and staff being bias towards Ms. Jesser and completely avoiding Plaintiff.

40. **Age Discrimination:** By disclosing her age, Plaintiff now was not considered worth giving the same training to. All managers were now avoiding her. Their focus was to train 27 year old Kayla Jesser in everything to make her a success. Mr. McDowell, Ms. Nolan and Mr. Nolan would not come to Plaintiff's cubical for anything but were always in Ms. Jesser's. They did not offer to train Plaintiff or help her, and they basically disregarded her and Plaintiff needed assistance on how to do her job and deal with their customers. Despite Plaintiff's 37 years of professional administrative sales experience, Plaintiff was being judged as an "old woman." Upon information and belief, if not for

Plaintiff's physical appearance Mr. McDowell would not have approved her hire especially if he had known Plaintiff was 60 years old. That is clear age discrimination.

41. **Age Discrimination:** During the week of November 28, 2022, during the four days of training in Ms. Vasquez's office to learn the DMS scheduling system, Plaintiff noticed how many times she heard both managers calling out Ms. Jesser's name repeatedly. "Kayla come here, Kayla… I want to show you this… Kayla this is for you." They repeatedly called out Ms. Jesser's name to the point that Sue Cole (another older CSR) made up an office chant, "Kayla, Kayla, Kayla!"

42. Ms. Cole told Plaintiff and others, "They think she (Ms. Jesser) is so smart." She also said, "I have been here for two years before Kayla, if they offer her a promotion; I am putting in a complaint."

43. **Age Discrimination:** Throughout the first two weeks, the bias was blatant. The managers were not trying to hide it as the managers could not stop from visiting Ms. Jesser's cubical. There was a regular rotation of managers in her cubicle while Plaintiff sat alone working on the busy phones struggling with the duties of her position. Ms. Jesser was learning and excelling at advanced steps, which Plaintiff had no knowledge about. She got around the clock privileged information including receiving free gifts, being taught new methods of making commission and other tricks to "advance in the Company," a new state of the art 27 inch dual monitors computer system, and other performance bonuses and commission that Plaintiff was not receiving. They were deliberately withholding vital information from Plaintiff to cause her to fail at her job.

44. **Age Discrimination:** Plaintiff had to ask Ms. Vasquez, "who is Kayla and how long has she been with Culligan?" Ms. Vasquez told Plaintiff Ms. Jesser was just hired the week

before Plaintiff was. It was a short week during Thanksgiving of 2022 that Ms. Jesser started so she only had a three day advantage over Plaintiff. However, Plaintiff was astounded by the tremendous attention she was receiving compared to what Plaintiff received. Plaintiff heard her name so often that Plaintiff thought she had worked there for over 10 years by the way the managers called for her. She was included in everything that the managers were working on which gave her a clear advantage over Plaintiff. This made her more knowledgeable about Culligan's policies, products, employee benefits, and all business practices.

45. **Age Discrimination:** Plaintiff realized that in her first week at Culligan there was a clear preferential bias towards the younger Ms. Jesser. The bias was so apparent that it was interfering with Plaintiff's ability to learn her job. Plaintiff was struggling so much to the point that she went on a second job interview at Mitchell Fuel in Danbury and they offered her a position in their Sales Department as discussed above. This job paid the same hourly rate but did not offer commission or the $2,000 sign-on bonus Culligan had offered. Plaintiff decided to stay with Culligan even though she was very unhappy due to the unfair bias but Plaintiff planned to bring this to the attention of the managers. Plaintiff thought it would be corrected as they had promised that no such bias existed in the office before she was hired.

46. **Protected Activity:** Plaintiff wrote several emails complaining to the managers about the issues she experienced and lack of support, but nothing was done.

47. Upon information and belief, Ms. Nolan hired Plaintiff on her qualifications but believed Plaintiff was much younger too. Mr. McDowell thought the same and approved her hire. Upon information and belief, the reason Mr. McDowell was so determined to find out

Plaintiff's age was because he took a closer look at her resume and the dates and then realized he needed to know if Plaintiff was worth investing time and training on. Despite how impressed both managers were at Plaintiff's interview, only a week into her employment, Plaintiff was negatively judged after she disclosed her age to Mr. McDowell.

48. **Age Discrimination:** During Plaintiff's first few months at Culligan after she had disclosed her age, January 2023 to August 2023, any staff member who went into the office with Danielle Nolan and Shawn McDowell came out of that office, avoiding Plaintiff and would not speak to her or visit her at her cubical.

49. **Age Discrimination:** Jim Nolan, the Service manager, was constantly in Ms. Nolan's office as they are married. The fact that they were married creates a conflict of interest when Plaintiff had to report Mr. Nolan's rude pronounced negative behavior towards Plaintiff to his wife. Therefore, Plaintiff was forced to report it to Shawn McDowell that Mr. Nolan was particularly rude to her and was particularly preferential with Ms. Jesser (because she was younger). Plaintiff told Mr. McDowell when she says, "good morning" to Mr. Nolan, he does not respond. He clearly heard Plaintiff. She felt so uncomfortable around him because Mr. Nolan is the Service Department manager and for no reason that Plaintiff could comprehend, he refused to talk to her at all and only answered her with one-word answers if he had to talk to her at all. This negatively affected Plaintiff's ability to get assistance with customers on the phone who have problems with the service department portion of her job. However, Mr. Nolan had no problem giving Ms. Jesser the support she needed to excel at her job.

50. **Protected Activity:** Plaintiff asked Mr. McDowell why Mr. Nolan did not like her or respond to her when Plaintiff spoke to him. Mr. McDowell said he would talk to him. However, even after Mr. McDowell spoke to him, Mr. Nolan still spoke to Plaintiff rudely, he was constantly curt when he did speak to her, and avoided helping her with service department questions.

51. **Discriminatory Actions:** From December of 2022 to present day, it was made clear that Plaintiff worked in a hostile work environment. Mr. McDowell and Ms. Nolan would yell out loud and scream out profanities during work hours. For example:

a. Mr. McDowell said this joke very often in the office. He said, **"I am so fat in the mornings when I wake up; I have trouble slipping into my "Latex suit."** Upon information and belief he was describing fitting into a condom. The only other thought would be a sleazy rubber body-suit. It was extremely uncomfortable and an inappropriate comment made by a male manager in the office in front of women.

b. Mr. McDowell also said out loud in the office, **"Do you know why it's good to date a homeless woman?** His punch line: **"Because after you are done with her, you can drop them off anywhere."**

c. This office listens to Ms. Nolan yell out loud, **"Oh Fuck!"** or **"mother fucker"** repeatedly while she is working in her office.

**d. Mr. McDowell called all the Culligan customers "assholes." He told Plaintiff he hates every single Culligan customer because they are all "assholes."**

52. **Discriminatory Action:** Mr. McDowell also tells crude and/or sexual jokes that are degrading towards women especially older women. In October of 2024, Mr. McDowell had hired two temps for the office. In front of the entire office, he introduced himself to one who was an older woman, and he told her, "Hi, I am Shawn McDowell, what is your name?" When the temp said "Katherine," Mr. McDowell replied, "my sister had the same name, Katherine . . . but **she's dead now**." The older female temp responded, "that was very rude." Two weeks later, because she did not laugh at his jokes, Mr. McDowell had a real dislike for her and he boasted to Plaintiff that he called the agency and had her removed.

53. **Discriminatory Action:** The staff speak out all day about work related situations or calling out to the managers for help, when Plaintiff would call out like they did she was told to "shut up" or use the phone to call managers. Mr. McDowell always mocked Plaintiff, discrediting her accomplishments, and speaking to her in derogatory fashion in front of everyone which encouraged others to treat her the same way. Ms. Nolan and Mr. McDowell were always screaming at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like Plaintiff was a child.

54. **Age Discrimination:** After working for Culligan three to four months into 2023 (March 2023), Plaintiff was struggling tremendously at her job as the lack of training was making her job much more difficult. The customers were abusive on the phones, while Plaintiff listened and watched Ms. Jesser continue to receive all the training information that Plaintiff needed to perform the same duties. At that time, Plaintiff approached Ms. Jesser in the office and Plaintiff asked her if she acknowledged the preferential treatment she was receiving from the managers and how Plaintiff had been isolated and treated so poorly.

Ms. Jesser admitted, “I do see it and I see how they treat you. I don’t know why it’s happening; I can only imagine how that must make you feel.” Plaintiff asked her if she would say “those same words to Shawn” because Plaintiff was planning on speaking to him about it and she said, “I am an honest person, I will tell him what I told you.” With that, Plaintiff asked to meet with Shawn McDowell to complain about unfair bias with Ms. Jesser and the discriminatory behavior against her.

55. **Protected Activity:** In mid-March of 2023, Plaintiff met with Mr. McDowell in his office and told him that Ms. Jesser clearly was receiving training and support that she was not getting. Plaintiff reported how Jim Nolan and Danielle Nolan speak to Ms. Jesser as if they have known her for 30 years, yet neither will speak to Plaintiff or assist her like they help Ms. Jesser. Plaintiff said, “Shawn you do not come to my desk for anything, either.” Mr. McDowell looked at her with a condescending smirk and said, “You must be having problems at home.” Plaintiff told him, “I am not having any problems at home. I am having problems at work.” Plaintiff told him that Ms. Jesser says if you call her in, she is willing to tell you that she agrees that there is obvious preferential bias towards her. Plaintiff told Mr. McDowell her exact words, “I do see the preferential treatment and how they treat you, I can only imagine how that must make you feel.” He denied that she would make that statement and was annoyed with Plaintiff that she was accusing her of saying that. He said, “Well, I will have to check to see if that is what Kayla said.” He said, “Kayla is like a sponge. I wish I had more Kayla’s in this office.”

56. Plaintiff reminded him of what he and Ms. Nolan told her before Plaintiff was hired, Plaintiff said, **“you both told me that you did not practice preferential bias in this office.”** Mr. McDowell said, “Kayla is doing a great job.” He said he would talk to Ms.

Jesser. He was trying to discredit Plaintiff's complaint as if she was stirring up trouble against Ms. Jesser. Plaintiff could tell he was very annoyed at her for bringing this to his attention. Mr. McDowell met with Ms. Jesser in his office with the door closed but never disclosed whether or not she had admitted to what she told Plaintiff. There was no follow up to that meeting.

57. While Plaintiff was hoping Ms. Jesser kept her word and confirmed the preferential bias towards her was real, she became much more concerned when she no longer would speak to Plaintiff about this and avoided her after meeting with Mr. McDowell. He clearly told Ms. Jesser not to speak to Plaintiff about it. Now, Plaintiff felt her job was in jeopardy. Plaintiff had no one to support her and Plaintiff felt depressed, she had severe anxiety, and now a fear of the repercussions of going to Mr. McDowell about this. It was clear Ms. Jesser was turned against Plaintiff just like everyone else who spoke to the managers. After Plaintiff complained to Mr. McDowell, the retaliation against her was very severe and they began to turned other service staff against her too. However, Plaintiff still wrote several complaint emails and sent them to both Ms. Nolan and Mr. McDowell. Nothing was done to help her.

58. **Discriminatory and Retaliatory Actions:** From December 2, 2022 through July 2023, Plaintiff had been ignored, poorly trained, denied equal information for commission opportunities, isolated, and continually blamed for mistakes made directly by other employee and even blamed for manager's mistakes. When Plaintiff would take on the added task of translating for Spanish and Portuguese customers, Plaintiff was mocked by Mr. McDowell as being "too loud" in the office. It was clear to Plaintiff that Mr. McDowell didn't care if they did business with these customers at all. He asked Plaintiff,

**"why do you have to speak so loudly when you speak Spanish, is it because they are hard of hearing or just stupid?"** He did not give Plaintiff credit for this extra work she did. No one else in the office speaks Spanish fluently.

59. **Discriminatory Actions:** Plaintiff was the only CSR able to assist Spanish and Portuguese customers. Unlike Plaintiff's past jobs that valued her translation skills, this was clearly not an asset in Mr. McDowell's opinion because Plaintiff was the one doing the translating. If Ms. Jesser would attempt to speak Spanish, he would praise her. Because no one at the office could speak Spanish, they would just say, "JO!!! Can you take care of this Customer?" Plaintiff was given extra work as part of her duties as she was expected to handle all Spanish callers or walk-in's for all CRS and managers. However, Mr. McDowell looked down upon Plaintiff for helping this lower class of people. His derogatory comments were clearly meant as a racial dig. When Plaintiff was speaking Spanish in the office, it only annoyed him to hear her. On other occasions, he had told Plaintiff she was too loud and to "shut [her] mouth."

60. By May of 2023, the abuse that they put Plaintiff through for the first months of her employment made her days long and hard. The only person Plaintiff trusted was Alton Moore, a Black, 55 year old, Service technician. Plaintiff was so depressed that Plaintiff wrote a note to Mr. Moore so he could read it and not have to say it out loud for fear of them hearing her. Plaintiff wrote, "I can't stay here, they treat me like crap, no one talks to me, they do not share information with me, they scream at me all the time." When he read the note, he had no words; he just patted Plaintiff on the shoulder and acknowledged her distress note to him. He told Plaintiff to "hang in there."

61. **Discriminatory and Retaliatory Actions:** Plaintiff was severely depressed and she had no one else to turn to. Plaintiff was so desperate for help that she was writing "help me notes." Plaintiff went home crying and stressed out every day trying to figure out why she was being targeted like this. Any of her work efforts were discredited, her performance ridiculed, and the managers ignored her complaints of bias and discrimination and retaliated against her by making continued false accusations towards her that were other employees' errors.

62. **Discriminatory Action:** In May of 2023, Mr. McDowell yelled out into the middle of the office. "I wish I had 10 Kayla's and **ZERO** JoAnn's" for everyone to hear. After he said this, Ms. Jesser came to Plaintiff's cubicle and said, "that was cruel for Shawn to say that." She also admits to the favoritism towards her by the managers but also had moments of showing "sympathy" for Plaintiff for the way Plaintiff was being discriminated against. Plaintiff had the sympathy of a few office witnesses.

63. **Discriminatory Action:** Between April, May, and June of 2023, Fabian Roman, a male serviceman approximately 50 years old and employed with Culligan for approximately 15 years spent lots of time in the offices of both managers Danielle Nolan and Jim Nolan. They were good friends inside and outside of Culligan. For no reason, Mr. Roman would leave their offices and he began calling Plaintiff a "nigger." He was formerly the service manager, but then returned to being a service man. Plaintiff had no idea why he would approach her and call her such a hateful word. Plaintiff did not know him at all for him to call her a "**nigger**." He said, "**What up, Nigger**." Plaintiff was so shocked. She had never been called a "**nigger**" before anywhere much less in an office setting. He called Plaintiff a "**nigger**" whenever he spoke to her. Every time he walked passed Plaintiff in the

morning and when he returned to the office in the afternoon, he would call her a "**nigger**" saying **"what's up, Nigger"** or "**have a good day, Nigger**." Plaintiff would respond, "My God, why are you calling me that?" He would say, "awww my bad, you're (slang) Peeerrr Rican" and walked away laughing. When Plaintiff got tired of the racial slurs, Plaintiff finally asked Mr. Roman: "Why are you treating me like this and attacking me when you know I am Puerto Rican like you are?" He didn't answer and he would smugly walk away. The next morning he would do it again. During this time, he would routinely hang out at Ms. Jesser's desk speaking too loudly, laughing, and making crude jokes. He was the loudest technician in the office. Plaintiff had enough of the loud drawn out distractions he caused at Ms. Jesser's desk and said to him, "I am on the phone with a customer, I can't hear, you are too loud." He responded with a threatening voice, **"What did you say? Hmmm... you don't want to mess with me."** Ms. Jesser just giggled finding this bully funny. Plaintiff did not know why he threatened her or disliked her and why he too avoided her and favored Ms. Jesser like the managers did. Upon information and belief, Mr. Roman was another male that was turned against Plaintiff by Ms. Nolan, Mr. Nolan, and Mr. McDowell.

64. **Discriminatory Action:** In April of 2023, Plaintiff was also threatened by Phil Tucker. He is a Black male office worker who retired from Culligan for over 20 years and works part time there. He was always in the offices with Ms. Nolan, Mr. Nolan, and Mr. McDowell. During these first 6 months of 2023, Mr. Tucker too followed what all the other staff were doing, ignoring, disliking Plaintiff for no reason, and verbally threatening her. When Mr. Tucker went to Ms. Jesser's desk, rarely was it work related, it was mostly chatting it up with her and laughing loudly while the phones were ringing. Even Mr.

McDowell has had to talk to Mr. Tucker about stopping people from doing their jobs with his long stories. Mr. Tucker did not chat with Plaintiff. One morning Mr. Tucker and Ms. Jesser were laughing and joking loudly. As instructed by the managers in a CSR staff meeting about the loud voices in the office, Plaintiff let Mr. Tucker know that she was on the telephone with an angry customer and “I can’t hear over the loud laughter.” He quickly snapped back and threatened me, “What... I know you are not talking to me, you better not even think about talking to me like that, I am not anyone you want to mess with.” Plaintiff only said, “I can’t hear the customer.” Plaintiff had never had any interaction with Mr. Tucker for him to treat her like this. There were several occasions that Mr. Tucker snapped at Plaintiff like that, he clearly followed what the managers had instructed him to do, he was turned against Plaintiff.

65. **Retaliation:** Plaintiff immediately sent an email to Ms. Nolan reporting that Plaintiff did not come to work to be threatened by the men in this office reporting what Mr. Tucker and Mr. Roman had said to her. It was the managers that instructed the CRS’s to tell others in **this extremely loud office** that we were on the phone with customers. Neither of those male employees were reprimanded or suspended for threatening Plaintiff. Plaintiff just became more of a target of retaliation for reporting them. When Plaintiff reported the abuse in the office, the managers refused to investigate retaliatory acts against her by other employees. Plaintiff continued to make complaints to them and they were made aware about the many instances of abuse from other employees and about the bias and unfair practices that were solely at her. Plaintiff also sent many emails to both managers asking for relief of abuse. Again, nothing was done to help her.

66. **Adverse Employment Action:** In March to April 2023, Plaintiff was assigned a monthly Excel Sales spreadsheet work task by Shawn McDowell, which was non-commission task that Phil Tucker performed before her. Mr. Tucker had to train Plaintiff after he threatened her. It made no sense that Mr. Tucker, who does not answer telephones or handled the task of scheduling customers or resolving their problems, would be relieved of this task and it being given to Plaintiff. Plaintiff was also assigned the daily delivery schedules, this required time off the phones to performed detailed work to assure the daily routes for 3 to 4 drivers. They would schedule deliveries and fill the trucks to capacity with over 45-47 items each to deliver to new and regular customers. The spreadsheet was a monthly sales accounting and balancing sheet of all monthly sales. It is an extremely detailed monitoring of Culligan equipment sold and installed by the office. It cannot be balanced properly if there is missing or inaccurate data. The monthly sales of parts and equipment with the part numbers must match the data inputted into Culligan's billing software by Ms. Nolan.

67. Plaintiff was under so much pressure and she had to still answer high volume problematic phone calls while finding time to complete the driver's schedules, 45-47 deliveries of water, salt and chemicals and filters, and prepare the spreadsheet. Plaintiff was overwhelmed further due to the continued discrimination and retaliation and deliberate lack of support from the managers.

68. Prior to submitting the spreadsheet to Corporate, Mr. McDowell would check the spreadsheet for accuracy and then report it to Wendy Osborne, Regional Manager. This is how each Culligan branch office compares monthly sales revenue to see which Culligan branch is out performing in Sales. During each month, Plaintiff had to struggle to find time to work on the spreadsheet. A file folder is made for each customer during sales and

installation of all Culligan Water filtration systems sold that month. The Sales office was responsible for creating the files, reporting the sales for each customer and monthly revenue, this includes rental equipment, and Commercial rentals and sales. Plaintiff was to prepare this spreadsheet by month's end deadlines. Mr. McDowell and Ms. Nolan specifically asked Plaintiff during her interview if she had Excel experience. Upon information and belief, this was one of the "highly impressive skills" that Plaintiff was hired for as she is an expert at Excel. However, this task took away from her ability to make commission.

69. When Mr. McDowell assigned Plaintiff the huge responsibility to monitor parts sold and track all monthly sales revenue on this spreadsheet, **he refused to give her a list of an inventory list with corresponding part numbers**, which was essential. Plaintiff specifically asked him, "do you have an inventory list with part numbers I can have?" He said he had it on his computer and did not want to share it to avoid the list being altered. Plaintiff asked him for a PDF to avoid that issue. However, Plaintiff was forced to rely on hand written scribble notes that were always transposed or not on the paperwork in each file, which caused Mr. McDowell to flip out on her when it was wrongly put into the spreadsheet. **This was the basis for the 30 days of hell he put Plaintiff through every month from March 2023 to May 2024.** Plaintiff was supposed to get the information from the Service Manager Jim Nolan, who would not speak to her. Mr. McDowell knew that the files were incomplete and the installers did not properly document sales parts and numbers or correct pricing. The sales department also failed to provide it at each month's end, but yet it was Plaintiff who was screamed at and blamed by Mr. McDowell.

70. Every month, Ms. Nolan had information she too had to provide for the spreadsheet by its deadline but was always causing Plaintiff's spreadsheets not to balance because Ms. Nolan would have several files she had inputting the billing for on her office that she failed to hand into to Plaintiff by the deadline. Ms. Nolan failing to give Plaintiff the folders was another example of the deliberate acts that would cause Plaintiff to fail at her job. The deadline was the first of each month. Mr. McDowell would pressure Plaintiff, "JoAnn do you have that spreadsheet yet." It would not balance and Plaintiff would have to stress about the screaming and intimidating snarls that he would put Plaintiff through because others failed to do their job. He always called Plaintiff into his office when Plaintiff would email him the spreadsheet and he would growl alike a rabid dog ready to attack, his teeth clenched to show anger, and to intimidate Plaintiff. He would pressure Plaintiff to submit the report with no part numbers knowing he had them. Plaintiff worked very hard to balance the sales sheet while information was deliberately held from her. Every time he screamed at Plaintiff, she would tell him, "It will never be complete because I need part numbers and an inventory list," but he refused to listen. It was clear it was month's end yet at this crunch for time, Ms. Nolan would make billing errors and still hold files away from Plaintiff. Mr. McDowell once got so angry with Plaintiff screaming in the office for all to hear, while Plaintiff was sick at this point, shattered by his screaming, Plaintiff trembled in complete fear and intimidation of losing her job.

71. Mr. McDowell continued the abuse and refusing to give Plaintiff the part numbers in PDF form every month. Plaintiff was verbally assaulted at month's end every month, for days, while being busy with angry customers on the phone. Plaintiff had requested on several occasions to be allowed time off the telephones on "do not disturb (DND)" to work on this

stressful spreadsheet and was denied each time by Mr. McDowell. However, Ms. Jesser was constantly allowed to be on "DND" when she was working on tasks for the managers. Mr. McDowell screamed at Plaintiff in his office saying, Plaintiff was incapable of doing this task saying, "what's this?" or "how did you come up with that number?" He would request the file and found that it was the installers that put the numbers in correct not her. Plaintiff could do nothing right in his eyes. He challenged Plaintiff while requesting each file one by one making her go back and forth to his office to be screamed at. Plaintiff told him each time to look at the file and that is what Plaintiff was forced to use, the numbers and parts in handwritten scribble in the files.

72. This went on for months, and one day Mr. McDowell got so violent, he screamed at Plaintiff, "I don't want you working on this anymore, I'll do it!!" He stormed into Plaintiff's small cubicle and grabbed a huge file box filled with that months files, it was approximately 25 pounds. In a rage and in the small space in Plaintiff's cubicle, approximately 2 ft behind her head, Mr. McDowell, who is about 275 pounds, comes flying in her space, picked up the large file box and swung it past the back of her head almost hitting her. "Give me the files, I'll do it myself!" Plaintiff had to duck her head down because of his aggression and swinging that size of a heavy box, while she was sitting at her desk in her office chair.

73. This near miss caused Plaintiff to crumble in fear. Plaintiff was on the phone with a customer at the same time. Plaintiff became very weak from extreme fear. If Plaintiff had not ducked her head down, Plaintiff was going to be hit in the head with a with that heavy file box. Plaintiff could not lift that box alone when it was full without properly grabbing the cut out handles. Mr. McDowell had no regard for Plaintiff's safety and charged into

her space, fast and furious, this caused her not to be able to speak on the phone. The customer asked, "hello are you there." Plaintiff apologized to the customer and told him to please hold on. Plaintiff was so weakened in fear, and she could not talk. After a few minutes, Plaintiff tried to gather her self-control to say, "I am so sorry, I am having a problem with a manager." The customer was kind enough to wait and sympathized. Plaintiff's hands were shaking and Plaintiff could not hold even the phone for how weak her arms became.

74. **Adverse Employment Action:** As mentioned above, Plaintiff also was blamed for the angry customers that were out of her control. Plaintiff was told she was allegedly rude to customers but when Ms. Jesser got an out of control customer on the phone, the managers would quickly assist her with anything she needed to appease the customer and avoid her getting the verbal abuse from the customer. Yet, Plaintiff was ignored, blamed, screamed at, and her tasks were deliberately made impossible in an effort to continue to retaliate against her.

75. **Adverse Employment Action/Sexual Harassment: In April 2023, Mr. McDowell made comments about the water softener that Plaintiff purchased from Culligan and the size she needed, and in front of two men, Jim Nolan, Danielle Nolan's husband, and a Salesman, Lance Hjelte, in Mr. McDowell's office. Mr. McDowell called Plaintiff into his office and asked in front of the two men, "This is the size softener you can fit in that area in your home, do you think *this size will satisfy you*?" putting the emphasis on the word, "satisfy." Mr. McDowell said it in a very suggestive voice making the two men in his office laugh out loud. Mr. McDowell knew the inappropriate, sexual inuendo he was implying. Plaintiff had not spoken much to Mr.**

**Nolan at all for Mr. McDowell to speak to her like that in front of him, a manager who already showed no respect for her. Plaintiff did not speak in that type of sexual undertone in the office ever to anyone. The two men knew exactly what Mr. McDowell meant by that comment and so did Plaintiff. To get out of there, Plaintiff said, "If that is the size that fits then that's fine." This moment was humiliating for Plaintiff. In her 37 years of sales experience, she had never be subjected to such disgusting behavior especially by a manager.**

76. From July of 2023 thru May 1, 2024, despite the retaliation, discrimination, and hostile work environment, Plaintiff was the highest CRS sales person for the Privilege program and service contracts. Plaintiff out sold other products reaching top seller. Plaintiff even outperformed Ms. Jesser who was "spoon fed" every opportunity Plaintiff was denied. Plaintiff beat all the other CSR's in the same role. However, Plaintiff was not given any recognition for her excellent performance. Instead, Ms. Nolan attempted to bury Plaintiff in alleged customer complaints against her (Plaintiff's name was not mentioned in those complaints) right before the weekend after July 20, 2023. Plaintiff was not given any performance improvement increases or bonus based on her performance at the Company other than the average 3% raise because many of these wrongfully blame mistakes that were held against her. However, Ms. Jesser received recognition and bonuses. She never had to ask for her commission after selling products but Plaintiff had to demand hers.

77. **<u>Discriminatory Action:</u>** During July and August of 2023, Mr. McDowell only allowed the young CSR females staff to train new hires. He refuses to allow Plaintiff or Sue Cole (who was 60 years old), also a CSR, to train new employees because Ms. Cole said, he believes older women are too old and stupid to train anyone.

78. **Discriminatory Actions:** Shawn McDowell constantly makes inappropriate comments about Plaintiff's weight and size, and her appearance, which are uncalled for. When he asked Plaintiff her race, he began making several slurs and sexual comments about her physical body. For example:

a. In July of 2023, Mr. McDowell would ask Plaintiff if she thought her breasts would grow into a Culligan shirt. He called Plaintiff into his office and said, "I have a Culligan shirt for you but I don't think you can fill it out. What size are you? You are very tiny. Maybe you can grow into it." It was a shirt and Plaintiff is a grown woman, clearly he was talking about the size of her chest and how small her breasts were. He always crossed the line like that. Plaintiff just took the shirt and thanked him and walked out.

b. During January of 2024, when Plaintiff wore leopard print coat to work, Mr. McDowell would comment that "You belong in a jungle" or that Plaintiff looked like a wild jungle woman.

c. In March of 2024, Mr. McDowell looked Plaintiff up and down and checked out her body and asked her "are you putting on weight?" He was behind Plaintiff when he made that comment. Plaintiff could tell he was checking out her rear end. Plaintiff found it highly uncomfortable for someone, especially her manager, to talk about her rear end.

d. On October 2, 2024, Plaintiff returned to work from FMLA after breaking her ankle (discussed further below), Plaintiff came to work that day and being Hispanic, her hair can be frizzy. Mr. McDowell came up to her cubicle and

said, "Welcome back, what did you do to your hair, why is your hair so frizzy, it's frizzy as hell."

79. **Protected Activity:** On August 23, 2023 after over eight months of relentless age and sex discrimination and targeting, and horrible abuse because Mr. McDowell hates older women in the office, Plaintiff wrote an email to HR (Ashley Floyd, HR manager) asking for relief of the abuse. During that time**,** many employees witnessed the harassment Plaintiff was being subjected to.

80. **Protected Activity:** At that point, Plaintiff was unable to work, she was depressed, she was crying, and she was always talking nervously. In her complaint, Plaintiff reported details of the hostile and discriminatory work environment Plaintiff was made to endure. Plaintiff specifically pointed to ageism and preferential treatment towards her younger co-worker, Kayla Jesser by the Company. Plaintiff made it clear that she made several attempts to report and address these issues with management. The frustration left her in tears at her home because Plaintiff could not stomach returning to work and being subjected to such a horrific environment.

81. **Retaliatory Actions:** On August 24, 2023, Plaintiff's car was hit and/or vandalized when she returned to work one day after sending the HR Complaint. Plaintiff did not go to work the day she sent the HR complaint because she was mentally and emotionally distraught. The damage indicated that someone had hit Plaintiff's car in the employee parking lot. When Plaintiff reported it to Mr. McDowell, the Company did not investigate it, and they denied it was retaliation. Both Wendy Osborne (Regional Manager) and Ashley Floyd (HR manager) refused to file an insurance claim for damage to Plaintiff's car, despite that it happened on Company grounds. The surveillance camera for that

parking lot showed the only vehicle that pulled into the handicap spot was **Kayla's Jesser's boyfriend's white truck**. Both managers saw it on video and both warned Ms. Jesser. Plaintiff's car had a white scratch and dent on the right side where he came close to her car, but the camera did not show the impact because of the angle. Plaintiff asked Ms. Jesser if she accidentally hit her car, if she could please check. Plaintiff was very non-accusatory but the camera showed only her boyfriend's vehicle.

82. The week of August 24, 2023 Mr. McDowell met with Ms. Jesser and instructed her not to respond to Plaintiff regarding her car damage. At that point, Ms. Jesser refused to check her vehicle for damage so Plaintiff had to report it to the police for her insurance. When Mr. McDowell was told by Ms. Jesser that the police went to her home, Mr. McDowell called Plaintiff in and said, "Culligan is not taking responsibility and what you did to Kayla was horrible." Plaintiff said, Ms. Jesser told her she would text her if she saw any damage, after Ms. Jesser talked to you, she would not answer any text. Plaintiff had to call the police for her insurance claim. They had no regard that this was going to cost Plaintiff at least a $1000 deductible. Plaintiff did have to fix her own car and Plaintiff did incur that high costing deductible.

83. **<u>Discriminatory Actions:</u>** In August and September of 2023, Plaintiff spoke with Sue Cole and others. They often stayed late to finish tasks that were easier when the phones stopped at 5 pm. Sue Cole, also a 60 year old CSR at Culligan told Plaintiff that she heard in the office that Plaintiff filed a complaint to HR. Plaintiff told her she did. Ms. Cole told Plaintiff that the managers were afraid of her because Plaintiff wrote the complaint. **<u>Ms. Cole confirmed that she had been the subject of severe age and sex discrimination by Shawn McDowell for two years prior to Plaintiff being hired. During those</u>**

**afterhours conversations is where Plaintiff learned Mr. McDowell's history of abuse towards older women, and that another older female had horrible troubles with him.**

84. On August 30, 2023, after Plaintiff filed the HR complaint, in a conversation between myself, Sue Cole, Julia Vasquez (another CSR), and Miles Trevonne (a Service technician at Culligan), Plaintiff was informed by all that Mr. McDowell had also been abusing two older women, one who worked there with Ms. Cole between 2020 to 2022. Ms. Cole said she witnessed the same type of age and gender discrimination by Mr. McDowell towards her that she described as "horrible." Ms. Cole stated in front of us that Mr. McDowell "hates older women in the office." **She said, "he was horrible to me, he made me cry all the time. I was a wreck all the time." She also said, "Shawn hates me and made my days so horrible. I went home in tears every night."** Sue further said, **"Shawn hates me because I'm old" and "He is a misogynist."**

85. Further, Mr. McDowell considers older women too old to learn and too old to invest time on training, and are denied equal opportunity at work and denied commission based opportunities or career advancement. Ms. Cole confided with Plaintiff that this older female person was working with Ms. Cole between 2020 to 2022. Mr. Trevonne confirmed all of this. Ms. Cole told Plaintiff Mr. McDowell was brutal to her and another older female between 2020 to 2022. This other unnamed female had just quit in the last two years when Plaintiff was hired on November 28, 2022. Further, she said other men in the office followed suit and abused her too. Ms. Cole who told Plaintiff she could totally understand what Plaintiff was going through but **"[she] was grateful that he was**

**targeting [Plaintiff] and no longer [her] anymore." She said to Plaintiff, "I don't feel sorry for you. I am glad the abuse is over for me and that it is your turn now."**

86. During that conversation Plaintiff was told that Mr. McDowell was going to try to force her to quit. Further, Mr. McDowell doesn't want to hire older women, and he has zero respect for older woman and mistreats them.

87. **Retaliatory Actions:** In September of 2023, Plaintiff was not informed of a meeting with HR and she was caught off guard, which has always been their method of attack. After management reviewed her HR Complaint, Plaintiff was abruptly called into an ambush meeting by 4 managers: Ms. Nolan, Mr. McDowell, Wendy Osborne (Regional Manager), and Ashley Floyd (HR manager). This was extremely inappropriate as her complaints were primarily about Mr. McDowell and Ms. Nolan. Clearly, this meeting was not meant to discuss her valid concerns. Instead, Plaintiff was questioned harshly by Ms. Osborne and Ms. Floyd, and falsely accused of being a non-team player. They went on the attack against Plaintiff. They said, "We read your complaint and we see others not having the same issues and if the job is too difficult for you, then maybe you need to think about that." They forced Plaintiff to explain the HR complaint that she wrote with two of the main bad actors present. Plaintiff was told by Mr. McDowell that her complaint was "bogus." **Plaintiff told them all she stood 100% with her HR Complaint. Plaintiff refused to retract anything she said.** Ms. Nolan defended Mr. McDowell when he screamed at Plaintiff about the spreadsheet and said Plaintiff was the one yelling in Mr. McDowell's office. Plaintiff reminded them that she was obviously not the one angry about the "spreadsheet." Plaintiff was the one nervous about being ripped apart for it. Plaintiff also said, "why would I be yelling at a General Manager?" In the

meeting they both also denied having preferential bias towards Ms. Jesser. They said she is a strong worker and that Plaintiff needs to focus on getting that spreadsheet done more accurately. Plaintiff explained that the parts numbers and lists were deliberately withheld from her by Mr. McDowell. They said Mr. McDowell denied that. Plaintiff said, "you make us go to DEI classes but the managers at Danbury all practice discrimination and bias." They responded that Plaintiff doesn't need to tell them when managers should have DEI training. Plaintiff said she shouldn't have to be their "whistleblower" to get them to have a managers meeting on how to follow their own mandated DEI class. Plaintiff questioned, "If I am forced to be compliant why aren't they?" Plaintiff did her best to speak without being afraid as she felt it was her only chance to get them to address the poor management and retaliation against her.

88. In the same meeting, Plaintiff also told Wendy Osborne and Ashley Floyd that she was being called a "Nigger" every morning by a service man and that Plaintiff was threatened by two male employees. Plaintiff was also harassed by Mr. McDowell and Ms. Nolan, and that Jim Nolan hasn't spoken to her for almost 8 months at that time. In response, Plaintiff was told she was not a team player because Plaintiff did not tell them who called her a "Nigger." They ignored her other complaints and focused on that one. Plaintiff was reluctant for fear of more retaliation from Fabian Roman especially with Mr. McDowell and Ms. Nolan present but they badgered her and pressured her saying, "then we can't help you. If we don't know." When Plaintiff told them it was Mr. Roman, Ashley Floyd abruptly disappeared off the screen as she participated virtually. Plaintiff told them she worked in HR previously, and she knows HR laws, and they are not being followed at all in the Danbury office.

89. Plaintiff also told Ms. Osborne and Ms. Floyd that Mr. McDowell almost hit her in the back of the head in her cubicle with the large sales file box full of files because he was angry about part numbers not on the spreadsheet and stormed over to her desk. He said, "Give me the files, I'll do it myself" and aggressively stormed into her small cubicle, grabbled the large file box and swung it past the back of her head. Plaintiff became so weak from fear of physical violence that she could barely speak and her heart was pounding. Plaintiff told them she was forced to duck her head down on her desk because he was right behind her and she was afraid. Plaintiff reported to them that Mr. McDowell was in a rage and did not care that he risked hitting her in the back of her head because he was crazed at that moment. Again, both Mr. McDowell and Ms. Nolan denied it.

90. Ms. Osborne and Ms. Floyd told Plaintiff they would follow up with her, but they never did. Plaintiff was forced to finish her job that day alone in the office and her schedules were not done all because of this "surprise attack" meeting. These corporate managers did not assist Plaintiff but instead retaliated against her for reporting the Danbury managers. They were in complete attack mode and defended the managers, but when they heard that Plaintiff was called a "Nigger" and who did it, they shut down the meeting.

91. **<u>Sexual Harassment:</u>** In fall of 2023, Ms. Jesser witnessed a Culligan driver, Edgar Muy, making sexual advances toward Plaintiff, she heard him moaning and whispering to Plaintiff whenever he stopped at her desk. Plaintiff handled his schedules, he was a delivery driver. Mr. Muy used the excuse to check his next day schedule to come to Plaintiff's desk and harass her. During the year of 2023, Plaintiff told Ms. Nolan and Mr. McDowell that Mr. Muy was very inappropriate and disrespectful on how he talks to her. But they defended him because Mr. Muy was a longtime employee. He knows his route

very well and comes in early, so they disregarded Plaintiff's complaints because he is needed as a driver.

92. **Sexual Harassment:** Not until November 2023, Ms. Jesser approached Plaintiff saying that she could hear the sexual advances that were being made to her by Mr. Muy. She stated it made her very uncomfortable, "I can hear what he is saying, I can hear the weird noises he makes, and it's disgusting." She told Plaintiff that she told Ms. Nolan about it. Plaintiff thought maybe she would get some relief if it was coming from her because she received so much preferential treatment. Plaintiff had made several complaints about Mr. Muy, but she was afraid they would spin the **sexual harassment** back onto Plaintiff. Ms. Jesser devised a plan to use a code word for Plaintiff to say when Mr. Muy came around her desk. While they had their differences, Ms. Jesser knew Mr. Muy's sexual harassment was not right. He said things like, **"I want to kiss you, I want to meet you after work, I want to eat you (sexually). I am going to eat this Puerto Rican before I leave Culligan."** He touched Plaintiff inappropriately and pursued her constantly and requested that Plaintiff meet him after work. Plaintiff refused every advance. One day, Ms. Jesser heard Plaintiff say the ***code word*** and she came over to her desk to shuffle through papers to make him uncomfortable. Thankfully, it worked and it did make him go away. Because the managers despise Plaintiff for previously reporting them to HR, they ignored the report from Ms. Jesser and allowed Mr. Muy's sexual harassment of her to continue without ever addressing it. After Plaintiff left Culligan on leave on January 13, 2025, she wrote an incident report to Ms. Nolan stating that she failed to stop the sexual harassment and told her Plaintiff knew Ms. Jesser had reported it to her and Mr. McDowell because Ms. Jesser said she did. The managers had full knowledge of Mr. Muy's behavior

because they witnessed him hanging out at Plaintiff's desk after his route ended. They knew and did nothing.

93. **Sexual Harassment:** In December 2023, approximately a month after Ms. Jesser reported Mr. Muy to the managers, at the first Christmas party Plaintiff attended in December 2023, Plaintiff had to ask two service men, Alton Moore and George Allen, to keep Mr. Muy away from her. They both agreed to help her. Plaintiff told both of them that she was being sexually harassed by him. They both were shocked but sat next to Plaintiff at the restaurant, one on each side to stop him from sitting next to her. Mr. Muy was very upset at the party and taunted Plaintiff to leave the party with him. Plaintiff avoided him at all costs. Plaintiff left the Christmas party when Mr. Muy turned his back to avoid him following her. The managers had full knowledge of his behavior.

94. **Discriminatory Actions:** In May 2024, Plaintiff broke her ankle and she requested an accommodation to work from home. Plaintiff was immediately denied and Mr. McDowell said she had to go on disability. When Plaintiff was on FMLA, she was forced to answer to 4 different agencies all seeking the same information about her medical status but they refused to share information and they repeatedly kept denying her claim.

95. **Age Discrimination:** On September 2, 2024, Plaintiff was denied to return to work on "light duty" after breaking her ankle. Managers refused to her request to use crutches or a knee brace in the office. They said they would not accommodate Plaintiff and she was told she could not come back to work with any medically necessary items and forced her to be on disability for another 4 weeks at a reduce pay from STD (at only 60% of her pay). **However**, in the summer of 2023 and again in fall of 2024 (October 2024), a younger female, Ms. Jesser, was allowed by managers to come to work using crutches on

2 separate occasions, the first occasion lasting several weeks. Ms. Jesser was also allowed to use an office chair with wheels to sit on and slide up and down the walkways around the office. This was no problem with the managers. As a result, Ms. Jesser received her full pay (100% pay plus commission).

96. **Age Discrimination:** In fall 2024, Ms. Jesser came to work with crutches for a second time; this was after Plaintiff returned from FMLA and was denied the same privilege of using crutches. Upon information and belief, this discrimination was due to her age.

97. **Retaliation:** Since Plaintiff returned to work from FMLA on October 2, 2024, the relentless bias and retaliation was only directed at her and it was severe in nature.

98. **Age Discrimination:** On October 22, 2024, Plaintiff went into Mr. McDowell's office and told them that Ms. Jesser had repeatedly called in causing them to be shorthanded. When Plaintiff told him that Sue Cole was also complaining about Ms. Jesser's disregard for others by calling out, Mr. McDowell told Plaintiff that Ms. Cole was not to be trusted because she talks about her in the office too. Plaintiff told Mr. McDowell when she complained about continued bias with Ms. Jesser that Ms. Cole agreed it was out of control. Ms. Jesser's behavior was also that of a spoiled child who thinks she is superior to the rest of the CSR staff because is aware of the preferential treatment.

99. **Retaliation:** When Plaintiff complained about it being swept under the carpet, the retaliation got worse. Plaintiff wrote an email and she asked to speak with Mr. McDowell and Ms. Nolan in the office. They could see Ms. Jesser calling was out every week. He responded by saying, "Kayla's call numbers are 48, yours are only 18 calls." However, he failed to say, Plaintiff was strangely deleted off of Ring Central, which keeps track of the CSR call numbers. That number was incorrect as Plaintiff kept track of her calls and she

took more than 600 calls and kept notes because she knew she was being sabotaged. The calls are monitored and Mr. McDowell stated several times that Plaintiff was not appearing on the Ring Central software, which accounts for the low numbers he was recording but he denied that was the reason for the low call number for Plaintiff. He brought up her alleged low call numbers to deflect. The low numbers he alleged are incorrect as Plaintiff took over 600 calls.

100. **Age Discrimination:** When Plaintiff asked why Ms. Jesser was able to wear crutches to work, Mr. McDowell replied, "your injury was much worse." He is not a doctor and was not in the position to determine the severity of an employee's injuries. That was the beginning of the next round of abuse and retaliation for reporting the discriminatory treatment. Plaintiff was disgusted that nothing would ever change in that office. Plaintiff went back to her desk dejected.

101. On October 31, 2024, Plaintiff was walking into work when she tripped and hit face-first into the hard ground outside the front door. Alton Moore witnessed the fall. Plaintiff hit her face very hard as her hands were holding her purse and lunch. Plaintiff was helped up by Mr. Moore. He did not leave her side and walked her to her desk. Plaintiff had hit her nose so hard into the ground and was completely dazed and hurt. He reported this to management because Plaintiff had hit her face very hard and he saw the impact. No manager approached her. Plaintiff let everyone in the office know she had fallen and injured herself because no one else did. Because of the complaint Plaintiff had raised about Ms. Jesser calling out excessively, Mr. McDowell had been very angry toward her so Plaintiff did not tell him she fell but she knew that Mr. Moore would because it was that bad. Culligan refused to file an incident report.

102. Mr. McDowell waited until two weeks later to tell Plaintiff that he heard she fell pretty bad. Plaintiff told him she thought she had broken her nose. He said: “you should have walked on the cement.” Plaintiff right away knew what he meant. Plaintiff said, “no because she would have been seriously injured.” Mr. McDowell changed the subject with a joke about his girlfriend falling too, because he said, “She was drunk!” Plaintiff said, “Well, I was not drunk, I was walking into work.” There was no incident report, no follow-up to see if Plaintiff was ok to work, and no concern at all by the Company. There was no proper incident report. Plaintiff did not seek immediate medical attention, she had abrasions on her nose and she told her doctor when Plaintiff saw him at one of her regular visits that she had fallen on her face at work. Plaintiff did not make a Workman’s compensation claim at that time, because she had zero knowledge about policies at Culligan because she had been denied that information throughout her career with Culligan.

103. Soon after Plaintiff made her October 22, 2024 complaint to Mr. McDowell about Ms. Jesser calling out, Ms. Jesser refused to get up and answer the front door for Plaintiff when she was freezing outside. It was 27 degrees outside. Plaintiff believe she refused to open the door because Plaintiff pointed out the disparate treatment between them to Mr. McDowell again. When Plaintiff reported this to the managers, she was told by Mr. McDowell, “why does Kayla have to answer the door? Was there anyone else in the office?” Plaintiff replied, “I only saw Kayla and I was freezing outside.” Plaintiff was soon called into Mr. McDowell’s office and told that Ms. Jesser was busy getting shelves put up in her cubicle, but it was 3 service men installing the shelves so basically she was just standing there while Plaintiff froze outside.

104. **Sexual Harassment:** On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been reported by Kayla Jesser to managers for witnessing him making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't care." Plaintiff said, "if the drivers don't care about the customers, then who will?" As part Plaintiff's job, she has to call the drivers to go back to customers' homes and for Mr. Muy to hang up on her was hugely disrespectful on top of the continued sexual harassment, which they were made aware.

105. As a result of Plaintiff's call with Mr. Muy and her comment "if the drivers don't care about the customers, then who will?," Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" He also called Ms. Nolan in while he screamed at Plaintiff. He was seething at the mouth. When Plaintiff entered his office he yelled, "Shut your mouth in this office" and "you are not to make work related comments in the office. We are all sick of hearing your comments." This was done in front of everyone, humiliating Plaintiff, and denying her right to speak as everyone else in the office does. These attacks are egregiously intimidating in nature and solely directed towards her. Plaintiff was already shaking, her heart pounding in fear of his tone of voice. Plaintiff had dealt with his aggressive snarls and hate in his eyes for too long. Plaintiff said, "everyone speaks out loud in the office during work all the time." He said with that snarling teeth grimace, "We are all sick of your comments! I don't want to hear any more of your comments on anything." Plaintiff

said, "I only said, if the drivers don't care then who will?" Mr. McDowell abruptly cut Plaintiff off and snapped, "This conversation is over!"

106. **First Panic Attack:** Due to this altercation and Mr. McDowell's history of attacks like this against Plaintiff for the duration of her employment with Culligan, (discuss further below), Plaintiff was shaking and having difficulty breathing. Plaintiff went back to her desk and suffered a hypertensive panic attack while she wrote an email to Ms. Nolan saying Mr. McDowell treats Plaintiff unfairly. Plaintiff could not breathe, she was trembling out of control, she had sharp shooting spasms in her upper spine, and she got weak and almost collapsed to the floor of the office. Plaintiff was in a small office cubicle so the managers saw that she was shaking, crying, and short of breath. **No one helped Plaintiff.**

107. It was Plaintiff's lunch hour so she drove to the ER, she was in a very life threatening state. Plaintiff was kept at the ER and her heart was pounding out of her chest. Plaintiff was kept out of work by her doctors until January 10, 2025. It was documented that Plaintiff's blood pressure was hypertensive at 156/78. Regularly, Plaintiff does not suffer from hypertension. The altercation at work was the lone cause.

108. Plaintiff texted Ms. Nolan on January 9, 2025 to **request accommodations** for her return to work on January 10, 2025 **as a result of her medical conditions** so that she could continue working: "Danielle, I will be in work tomorrow morning at my desk. I won't be able to take my medication because it makes me drowsy. If Shawn would like to talk to me at any point in time of the day, please have him email me. Until my blood pressure is under control, I want minimal exposure to the toxic environment that continues to affect my health. None of the issues I have brought forward to management have ever been

resolved in that office. I am seeking relief from the abuse. I am still under my Doctors supervision. Please do not call me into any surprise ambushes from Shawn or anyone else as I don't believe I will be able to physically absorb it at this time. I request an HR advocate every time I get called into the office and if that's not possible then just email me and I'll be happy to continue to do my job as I was hired to do, but the rest of the stuff has nothing to do with me and I'm not going to quit my job so the pressure can just stop because I'm not going anywhere. I am available by email." Culligan failed to participate in the interactive process and the retaliation and discrimination only continued and escalated further as evidenced by the events on January 13, 2025 (discussed below).

109. On Friday, January 10, 2025, Plaintiff returned to work with the ER note and a letter from her doctors. That day, Plaintiff emailed Ms. Nolan two pages of documents. One was a discharge form from the ER that stated that Plaintiff was seen at the ER on January 3, 2025 and she was to be out of work until she saw her PCP and Workers' Compensation orthopedic physician. The second was a "Certification to Return to School/Work" form from her PCP that informed Ms. Nolan that Plaintiff was seen on January 6, 2025 and that she was to remain out of work from January 6, 2025 to January 9, 2025. To be kept out of work by the ER for an undetermined time indicated the severity of her medical condition. She had both doctors' notes, but Plaintiff feared that they would retaliate against her again knowing her conditions.

110. On that same day, Plaintiff had a problem customer on the phone, she asked Mr. McDowell how to remedy and the customer was happy with the resolution to schedule another appointment. Sue Cole was still in the office, it was just before 5 pm. For some reason, she decided to challenge Plaintiff on the appointment she scheduled with Mr.

McDowell's approval. Then, she badgered and harassed Plaintiff about this out loud for others to hear for over a half hour, Shawn McDowell not only witnessed it but also fueled the incident by starting to question Plaintiff on whether or not the customer was due another service call. Plaintiff told both Ms. Cole and Mr. McDowell that the customer was irate, she had already explained the customer's issue to Mr. McDowell, and he approved another service call. Still, he heard Ms. Cole badgering Plaintiff and allowed her to interrogate Plaintiff. Plaintiff was still not feeling well from her panic attack 10 days prior and was unable to take her blood pressure medication or to monitor her blood pressure so Plaintiff was forced to continue to defend her actions and remained as calm as possible during this attack. Ms. Cole kept getting louder and louder with Mr. McDowell standing right next to her in her cubicle. He knew Plaintiff had just returned to work from a severe panic attack. She repeated that this customer was not due a service call. The only reason Ms. Cole was creating such a scene by interrogating Plaintiff on this was because she believed they had to go back to the customers home due to an error *Ms. Cole* made with the same customer and she feared getting into trouble as another older worker. Again, Mr. McDowell was aware that Plaintiff had just returned from medical leave. He did not tell Ms. Cole that he gave approval for the appointment. He just walked out and left Plaintiff alone to deal with her. She was so loud and obnoxious that Plaintiff grabbed her coat and left the building.

111. In January 2025, Ms. Cole met with both the managers very often in their offices and she too was turned against Plaintiff just like everyone else. Prior to this, it was Ms. Cole who not only acknowledged being discriminated against by Mr. McDowell calling him "**a misogynist**" she also acknowledged that he was now targeting Plaintiff because "**Shawn**

**<u>hates older women working in the office.</u>"** This is why Ms. Cole felt confident enough to heckle and harass Plaintiff on January 10, 2025 in front of Mr. McDowell while Plaintiff was doing her job. Ms. Cole is not a supervisor and is also a customer service representative. There was no reason for her to get involved but because Ms. Cole had Mr. McDowell by her side, it fueled her misconduct against Plaintiff. Mr. McDowell wanted Plaintiff gone. Recall, Ms. Cole told Plaintiff that she was a victim of age discrimination by Mr. McDowell for two years prior to the abuse she was witnessing Plaintiff go through. She said to Plaintiff in front of others, **<u>"I don't feel sorry for you. I am glad the abuse is over for me and that it is your turn now."</u>**

112. On Monday morning, January 13, 2025, Plaintiff asked Ms. Cole to stop harassing her when Plaintiff was just trying to do her job. Despite Mr. McDowell witnessing Ms. Cole's attacks that past Friday, they allowed her to unfairly accuse Plaintiff of being aggressive.

113. Then, Plaintiff was called into Ms. Nolan's office and she said, the reason why Ms. Cole was so defensive about the customer was because she believed that she had booked the customer's previous appointment with Alton Moore and he had no supply on his truck. It does fall back on schedulers to note to bring chemicals to a service call, and they get commission for it. Ms. Nolan admitted it was scheduled by Alysha Giannone, another CRS. Ms. Giannone is Caucasian and 30 year younger than Plaintiff, approximately 30-years-old. Ms. Nolan said Ms. Cole was afraid she did something wrong and since she knew that Mr. McDowell would blame her and be ruthless about it because he has been in the past. It was clear after their conversation that Ms. Nolan understood Plaintiff's side of the story after the meeting, or so Plaintiff thought.

114. **<u>Second Panic Attack</u>:** Later, on January 13, 2025, around 1:40 pm, Plaintiff was ambushed again and told to report to Mr. McDowell's office without warning, Plaintiff had met with Ms. Nolan in the morning thinking she understood her side of the story but then later that afternoon Plaintiff was ambushed by Mr. McDowell, despite her doctors' and an ER note, with Ms. Nolan standing pacing back and forth telling her to put her phone on DND and report to Mr. McDowell's office suddenly. Plaintiff was sick, and Plaintiff told her, "I can't I am shaking." Plaintiff's heart was racing and she was short of breath. She stood over Plaintiff and paced back to Mr. McDowell's office saying, "she's not getting up" and "she is not coming." Plaintiff asked her, "Please Danielle, I can't go in there, I am shaking and having a panic attack." All this while Plaintiff had given her a written note from her doctor and the ER doctor stating that Plaintiff had a **<u>hypertensive panic attack 10 days earlier</u>.** Mr. McDowell demanded she go and escort Plaintiff in. Plaintiff took her time to try to breathe and calm down, Plaintiff was pulled in not allowed to speak. Mr. McDowell had a snarl on his face and slapped a written warning down on his desk in front of Plaintiff. Mr. McDowell told Plaintiff that she was being written up for the alleged harassment of Sue Cole. The narrative was twisted to make Plaintiff sound like *she* was violent, which she was not. Plaintiff had just had a panic attack 10 days earlier. Plaintiff was not aggressive just tired and a bundle of nerves fearing a heart attack.

115. Plaintiff was slapped with a "written warning" for alleged harassment by Mr. McDowell and he put in writing that Plaintiff was "violent." This written warning was prepared for Plaintiff's personnel file in order to force her out of Culligan. The facts were deliberately distorted to make m Plaintiff e look like a violent aggressor. Plaintiff understands that

harassment is a crime and she takes it very seriously as Plaintiff has been *the* victim of it while working for Culligan. Mr. McDowell falsely called Plaintiff, "violent." However, Plaintiff did not harass another employee, Sue Cole. In fact, she had harassed Plaintiff with Mr. McDowell's approval.

116. Tired of the twisted lies and abuse Plaintiff told Mr. McDowell she was reporting him to the EEOC. Plaintiff was short of breath and shaking, tears streaming down her face. He responded, "Who? I don't care!" Then, he ordered Plaintiff to take harassment training with a deadline and if she did not complete the training, he threatened Plaintiff with suspension without pay if not completed by the date written on the warning. Upon information and belief, someone else was listening on the phone. Plaintiff believes Mr. McDowell said Ashley Floyd was listening on the phone. Ms. Nolan was also standing over Plaintiff in the office. Plaintiff took the paper and left the office. Plaintiff was suffering a second severe panic attack due to this altercation and the continued harassment and discrimination by them.

117. Since then, Ms. Cole has become an informant to the two managers and betrayed Plaintiff. Now she assisted Mr. McDowell in causing that whole scene on January 13, 2025. She lied making it more conceivable for Plaintiff to be blamed and get the written warning. She was the one that was harassing Plaintiff in front of Mr. McDowell and then he defended her and targeted Plaintiff getting Wendy Osborne and Ashley Floyd involved along with Ms. Nolan and ambushed Plaintiff with that written warning.

118. The second panic attack Plaintiff suffered was more severe with her blood pressure higher this time with chest pains. Before Plaintiff left for the ER, she emailed Ms. Nolan: "I am leaving to go to the hospital, I have excruciating chest pains, my hands are trembling, and

I am under the care of my doctor to check my blood pressure daily. I am constantly retaliated against my Shawn McDowell and todays actions prove it." Then, Plaintiff rushed herself to the ER. Plaintiff had chest pains, shortness of breath, and she was shaking uncontrollably. Plaintiff was still under a doctor's care from her first panic attack 10 days earlier. Plaintiff is 63 years old. Her body can no longer endure the stress from the constant ambushes of discrimination and retaliation from her managers.

119. Following January 13, 2025, Plaintiff was on Short Term Disability ("STD") or so she thought. Danielle Nolan and Shawn McDowell gave a statement to Workers' Compensation that her panic attacks were not work related. They are not medical professionals. Prior to their mistreatment and discrimination, Plaintiff never had hypertension or any history of heart disease. The statement was taken by an agent for The Cincinnati Group, he told Plaintiff that she was denied because a statement by Mr. McDowell and Ms. Nolan denied her panic attack was work related.

120. On January 13, 2025, while Plaintiff was on medical leave, she got a call from Ashley Floyd. She called because Plaintiff told them in an email that Plaintiff was going to file with the EEOC for discrimination and abuse. Plaintiff told her that Plaintiff wanted the false accusations of harassment against her retracted from her employee file. Mr. McDowell lied on this written warning. He prepared it with malicious intent. The written warning is all lies, far from the true events that occurred. In fact, the harassment was committed against Plaintiff by Sue Cole and witnessed by Mr. McDowell. Ms. Floyd asked if it would make Plaintiff happier if Ms. Cole was written up also? Plaintiff said she should be written up but Plaintiff will not be wrongfully accused of a crime. Plaintiff wanted her name cleared. She said she would get back to Plaintiff but asked, "are you

recording me?" Plaintiff does not know if anything was done but currently the written warning was added to her permanent employee file.

121. From January 27, 2025 to May 1, 2025, through conversations back-and-forth with Lindsey Seller of Absence Management who manages STD claims for Culligan. Ms. Sellers working along with Ms. Floyd continued to mislead Plaintiff in believing that she was on basic paid STD and it was just a matter of a few documents that Blue Cross Blue Shield of Illinois had requested for Plaintiff to file before she was approved for paid benefits while on STD. Upon information and belief, Plaintiff was misled deliberately by Ms. Floyd, who directed Ms. Sellers who tried to be extremely helpful but got caught up in the corruption of the HR manager and the managers at the Danbury office. No one offered Plaintiff LTD when her STD benefits were exhausted. Blue Cross Blue Shield of Illinois never informed Plaintiff that they did not cover work related accidents or illnesses previously. It was only in April 2025 after several exhausting attempts to find out why Plaintiff was not being paid that she asked to speak to a supervisor at Blue Cross Blue Shield. It was then and only then that Plaintiff found out they would not be covering her illness because it was work related. However, Ms. Nolan and Mr. McDowell gave statements stating Plaintiff's panic attacks were not work related. Plaintiff's panic attacks both took place during working hours as a result of the actions of Ms. Nolan and Mr. McDowell.

122. There's a huge contradiction and was a continued attempt to keep Plaintiff out of the office, unpaid, despite her doctors notifications that Plaintiff had chronic severe hypertensive panic attacks of which none of these individuals took into consideration and only exacerbated, causing Plaintiff to experience another panic attack at the New Milford

town hall where her first Workers' Compensation hearing was going to take place. Plaintiff had difficulty breathing in the elevator. Her heart was pounding out of her chest. This panic attack was due to the anxiety of seeing the two snarling faces of the managers at Culligan who had mentally and emotionally abused Plaintiff because they wanted to get rid of her one week after Plaintiff was hired because she was too old to be worthy of fair, unbiased opportunities and training at Culligan.

123. When Plaintiff sought medical treatment, she was not provided with Workers' Compensation information to file a claim. Plaintiff was told by Absence Management that she should be speaking to someone in Workers' Compensation. Plaintiff said to the person who gave her the information from Absence Management that she was in a hostile work environment situation, and the managers did not offer her any information whatsoever about what to do to file a Workers' Compensation claim. It was Absence Management that told Plaintiff to send something to demand it from Ms. Nolan. Plaintiff requested benefit information repeatedly from Ms. Nolan, but she never told Plaintiff that she needed to contact Workers' Compensation. She referred Plaintiff to ULTIPRO, which is their employee sign on accounts, which had no information for Plaintiff and Plaintiff continued to ask for information about benefits while she was out on leave during the incidents on January 3, 2025 and January 13, 2025.

124. Plaintiff's doctor opined that she was suffering from anxiety and panic attacks due to work place hostility. He also wrote, "Pt. is unable to complete or perform tasks at work due to increase anxiety, due to hostile work environment." He disclosed that Plaintiff had "multiple panic attacks with tachycardia, anxiety during work events and multiple ED visits." This information was provided to Blue Cross Blue Shield of Illinois.

125. In April 2025, Plaintiff was told by her coworker, Alton Moore, that Ms. Jesser was approved to work from home several weeks ago. She informed everyone in the office that she only stayed at her jobs for 2 years and grew bored. Because they invested so much into 27-year-old Ms. Jesser, she was now able to work from home and they claimed they made a new position, which entitled her to that. This was all to keep her from quitting. Plaintiff had a strong record of work at Culligan along with 37 years of corporate-level experience and no accommodations were made for Plaintiff prior to the STD she was on. Plaintiff requested an "accommodation" due to her health condition. However, she was told that her position could not be done remotely. However, it can be as Plaintiff worked remotely previously. Culligan claimed it was due to certain circumstances but the ability to work remotely successfully in her position exists.

126. Plaintiff has been working with Culligan regarding her requested accommodation to work remotely, which is supported by her health providers. Because Plaintiff was denied the ability to return to her position as a CSR and obtain commissions, Plaintiff has lost income. According to Ms. Floyd, the essential functions of the Service and Route Coordinator role allegedly could not be performed remotely, and offered Plaintiff the positions for Billing and Collections Coordinator or Customer Relationship Specialist so that Plaintiff could continue to work. However, it was Plaintiff's understanding that her position at the Company was a Customer Service Representative ("CSR"). Plaintiff was not aware that her role title changed to Service and Route Coordinator.

127. Plaintiff's new title is not recognized by the Sales Department as a Customer Relationship Specialist and is essentially a demotion. Plaintiff was told by Todd Campbell, her new supervisor, and by Sean McKenna, Digital & Field Marketing Lead,

that her title is Lead Catcher. Plaintiff's role was to be responding to leads that come in through the Internet and making at least four contact attempts to those sales leads and referring it to the proper sales territory. The job description and title given are different from the ones provided to Plaintiff by Ms. Floyd. Since Plaintiff began working in this position, it is clear to her that Plaintiff reached the bottom of the Culligan Corporate ladder. Her real title is "Lead Catcher." It requires minimal intelligence and low human interaction. Plaintiff continues to be isolated and depressed due to this demotion. Plaintiff lost the extra income from commission and bonuses she should have received but was denied by the same managers. Moreover, Plaintiff feels trapped in this most "unfair" situation.

128. Because Plaintiff is working remotely, she requested office supplies she needs to succeed in her new position from Ashley Floyd. Plaintiff's current supervisor has represented that he attempted to get her the tools she needs. However, the Danbury office continues to refuse to provide Plaintiff with the tools and supplies she needs. Further, Plaintiff was provided items that were left at her old desk at the Danbury office. Plaintiff was disgusted by what was given to her. Everything was thrown in a box, which showed an extreme lack of care given to the things Plaintiff left behind when she unexpectedly had to take leave. Plaintiff was given dirty Chinese soup containers, which were clearly garbage. Plaintiff also received a box of upside down tea. In other words, it was emptied into the boxes. Her things were all just dumped in two boxes and delivered as garbage with zero regard for how this would affect Plaintiff. Culligan continues to mistreat Plaintiff despite still being an employee.

129. Recently, Plaintiff discovered that Ms. Jesser (younger) was promoted to Call Center Supervisor, which is a remote position, and she is now a supervisor of 14 staff members. Upon information and belief, she is making far more money than Plaintiff. As a supervisor, Plaintiff believes Ms. Jesser's salary is now significantly greater than hers.

130. Plaintiff was and still is insulted and humiliated over Mr. McDowell's egregious attack against her as a 60 year old female at the time of hire with 37 years of stellar commendations from her previous employers. Plaintiff never harassed anyone or been violent in 37 years working in an office setting. This warning was intended to get Plaintiff to quit and/or to use as ammunition against her in her permanent employee file.

131. Plaintiff lived in fear of the next attack and always caught off guard by Ms. Nolan who is three times Plaintiff's size and wears combat boots. She would appear behind Plaintiff, demand Plaintiff put her phone on "Do Not Disturb," and demand that Plaintiff report to Mr. McDowell's office and Plaintiff would be multitasking on the phones, working on the Sales spreadsheet or doing her schedules for the next day deliveries. No consideration for the level of stress Plaintiff was always under. Being attacked by Mr. McDowell and Ms. Nolan was a living hell for Plaintiff. Plaintiff developed such anxiety attacks because it was nerve shattering to her. Ms. Nolan also gave Plaintiff the most heinous looks to make sure Plaintiff understood Ms. Nolan hated Plaintiff. Plaintiff did nothing to Ms. Nolan. In fact, this sudden change was shocking as Ms. Nolan was so impressed with Plaintiff before Plaintiff started. Then, when Plaintiff disclosed her age to Mr. McDowell, everything changed for Plaintiff.

132. Culligan has a hostile work environment and they are aware of how their employees feel. The managers have a history of abusing older women, which includes Plaintiff and Sue

Cole and another older woman who quit in 2021. Kathleen Glover, that older woman, was hired at Culligan during the summer of 2023, she quit after approximately one week. She went to lunch and never came back.

133. Ms. Glover wrote a long email to Mr. McDowell stating that he was the cause of that extremely toxic work environment because he sat in his office screaming out into the office for other's to hear. During her short time at Culligan, Ms. Glover admitted to Plaintiff that Mr. McDowell told her to "stay away from JoAnn." Plaintiff never did anything to deserve this or met Ms. Glover. He said that to anyone who got hired. Ms. Glover witnessed the abuse that was inflicted on Plaintiff because no one else was treated like Plaintiff was. Mr. McDowell has that email. The email was so harsh that he gathered a CRS staff in an impromptu meeting and told them about the email and said, "Kathleen said I was the reason for the toxicity, am I really that bad?" Plaintiff sat there in that meeting wanting to say, "Yes, you are" because the screaming out of the office during the time that Kathleen Glover was there was all directed towards Plaintiff and Ms. Glover witnessed it. When Plaintiff heard that email existed she had already been put through 7 months of age discrimination, isolation, mental abuse, targeting retaliation, sexual harassment and being called a "**<u>NIGGER</u>**." Plaintiff asked Mr. McDowell if he could share a copy of the email and he immediately refused.

134. Both managers carry out verbal aggression, intimidating dirty looks, sneak attacks, backstabbing, and administrative retaliation against Plaintiff as discussed above. They both lie, making false accusations against Plaintiff with defamatory statements about her both verbally and now in a written warning. They have intentionally created a non-inclusive environment for Plaintiff. This started before and continued after Plaintiff

reported it to Human Resources on August 23, 2023. The managers are directly responsible for creating an environment where other staff members were threatening Plaintiff and a service man, Mr. Roman, called her a "nigger" in the office every morning and afternoon. Mr. McDowell has a history of running a toxic environment which influences others to follow suit and treat Plaintiff badly, which is directed by all three managers. It started Plaintiff's second week of work, which was December 5, 2022 to the time Plaintiff went on leave for the last time on January 13, 2025. This is targeting due to her age and gender and race. Mr. McDowell would not attack Plaintiff if she were a man and/or younger Caucasian female.

135. The behaviors of Ms. Nolan and Mr. McDowell have caused Plaintiff many debilitating nervous attacks because they deliberately sneak up from behind Plaintiff without warning ordering her to report to the general manager's office for repeated verbal abuse and false accusations. Plaintiff have been called into the office more than 25 times in the last two years more than any other person in the entire office without cause. Plaintiff suffered from isolation and depression and mental anguish because she had nowhere else to turn to. The managers are corrupt and they violate their own DEI Policies.

136. Ms. Nolan and Mr. McDowell lied to Plaintiff during her interview as they represented that there was no "favoritism or bias," when there is, as they discriminated against Plaintiff based on her age, gender, and race. They fraudulently misrepresented Plaintiff's work environment, as a result, she suffered immensely.

137. Because of Plaintiff's age, gender, and race, she was denied the same job opportunities, training, and benefits that were given two younger female customer service representative, Kayla Jesser (27) and Julia Vasquez (19).

138. Plaintiff have been isolated, called racial names, sexually harassed, and threatened. Her car was vandalized and Plaintiff has verbal confrontations from management. Plaintiff has been denied any relief or assistance from Regional Manager Wendy Osborne or HR manager Ashley Floyd. They continue to discredit Plaintiff's claims of discrimination, sexual harassment, and retaliation. The two corporate managers facilitated and participated in the retaliated against Plaintiff.

139. The written warning is an attack on Plaintiff's professional reputation. Mr. McDowell falsified the narrative and accused Plaintiff of a crime she did not commit. He has slandered Plaintiff so that when he terminates her, Plaintiff won't be able to collect unemployment compensation. The written warning accused Plaintiff of harassment and stated that she went into Ms. Cole's cubicle and harassed her and was violent, which was untrue. Upon information and belief, Mr. McDowell met with all the CRS's and turned them all against Plaintiff and slapped her with a very defaming accusation. This written warning was meant to make Plaintiff quit and/or for something in her file to terminate her. Prior to January 13, 2025, Plaintiff never received any warnings about her performance.

140. Plaintiff has been a loyal hardworking employee with great performance records at Culligan. Plaintiff treats the customers like she would treat her own family. Plaintiff provides translation for Spanish speaking customers that Culligan does not appreciate or compensate her for. They ignored customer's commendations emails about the quality service Plaintiff provided them. Mr. McDowell and Ms. Nolan created restrictions for Plaintiff to make her fail and quit her job. Plaintiff has endured a lot of abuse.

141. Plaintiff's performance has been excellent for the customers. Plaintiff outperformed the highest sales customer service representative for over a year but she has been denied proof of payment of her rightfully earned commission pay. The managers try to impede her ability to make commission. Plaintiff requested an audit of her commission sales for proof of pay for her labor.

142. Plaintiff was discriminated and retaliated against in her employment with Culligan substantially because of her age, race, and gender as Plaintiff is an older Hispanic female. Culligan discriminated against her in the terms, conditions, and privileges of employment on account of her protected statuses.

143. As a result of the unfair and discriminatory treatment by Culligan, Plaintiff experienced emotional distress including but not limited to, panic attacks, hypertension, increased stress and anxiety, insomnia, and internal tremor syndrome, which feels like Plaintiff is shaking inside all the time even when she sleeps, the tremors make her afraid for her health. Plaintiff suffers from depression and self-doubting, and feelings of being denied her human rights. Plaintiff feels singled out and persecuted by people who her work for who should never assume that can treat her like they have. Plaintiff is a professional and take pride in being kind to others and assertive at work. Plaintiff never harassed anyone at any job and she felt dejected and beaten down to the point of illness that feels like a heart attack by her job. At 62.5 years old, Plaintiff is entitled to be treated fairly and not discriminated against for such a long period of time. Plaintiff sought relief as directed by the Culligan California Law DEI classes. None of the methods mentioned in how to report harassment are followed by Shawn McDowell, Danielle Nolan, Wendy Osborne, Ashley Floyd, or Jim Nolan. Plaintiff believes there are a trail of women who have been

subjected to "hate against older women in the work place" by Shawn McDowell and Danielle Nolan.

144. In Plaintiff's current position as part of her requested accommodations, he has continued to experience retaliation and discriminatory actions by Culligan management due to her complaint filings with the CHRO and EEOC. Such adverse actions include but are not limited to, the removal of Plaintiff's duties, denial of equal work opportunities, targeted humiliation, manipulation of performance metrics, and the deliberate assignment of low-quality leads after she began to excel in her role. Culligan has continued to undermine Plaintiff's accommodations by unequal treatment compared to other Lead Catchers, and management's continued dismissal of Plaintiff's complaints. This retaliation has directly harmed Plaintiff's ability to perform, affected her mental health, and appears to be designed to discredit her agency complaints.

145. Plaintiff has continued to raise concerns about the above to Defendants. When Plaintiff's call volume increased, the sales staff took notice of her work and Plaintiff was prohibited from calling those higher-probability leads as a result.

146. Recently, during a conversation with sales representative, they informed Plaintiff that the reason she continues to receive extremely low-probability "dead" leads is because Defendants' management wants younger, part-time lead catchers to appear more successful. The sales representative specifically stated that Scott Kimmel's daughter, Mia Kimmel, and Jeni Cline's daughter, Alyssa Sauer, who are both very young, recently hired employees, are being given higher-quality leads with strong conversion probability. This was explained as part of an intentional effort to push the "younger generation" forward as the future of Defendants, while older employees are pushed aside into roles

with little or no chance of success like Plaintiff. Thus, Defendants continue to make a concerted effort to the obstruct of Plaintiff's ability to meet performance expectations.

147. Plaintiff's experience with Culligan due to their toxic work environment has been detrimental to her health and well-being. Because of the discrimination of Culligan, Plaintiff suffered and continues to suffer loss of income, loss of benefits, severe emotional distress, damage to her property, loss of medical treatment under Workers' Compensation, and other damages and losses.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

## COUNT ONE: AGE DISCRIMINATION IN VIOLATION OF ADEA

148. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 147, as if fully set forth herein.

149. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her age.

150. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

   a. When Plaintiff first applied and interviewed for a Sales Coordinator position in sales, she did not get that position. This job was given to a substantially younger and substantially less experienced 19 year old CSR;

   b. Upon finding out Plaintiff's age, Culligan's attitude toward Plaintiff had change completely and took a turn where she was ignored by managers, denied proper training, avoided by staff, denied job opportunities and benefits, treated poorly by everyone on the office, and discriminated against, because

Plaintiff told Mr. McDowell her age;

c. Kayla Jesser, who was significantly younger, received exceptional training and motivational support by the same managers that mistreated Plaintiff because of her age;

d. Ms. Jesser was included in everything that the managers were working on which gave her a clear advantage over Plaintiff. This made her more knowledgeable about Culligan's policies, products, employee benefits, and all business practices;

e. Plaintiff would be ignored by Jim Nolan, the Service manager and Ms. Nolan's husband, negatively affecting Plaintiff's ability to get assistance with customers on the phone who have problems with the service department portion of her job. Ms. Jesser was not treated the same way;

f. Ms. Nolan and Mr. McDowell were always screaming at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like Plaintiff was a child;

g. When Plaintiff would take on the added task of translating for Spanish and Portuguese customers, Plaintiff was mocked by Mr. McDowell, but when Ms. Jesser attempted to speak Spanish, he would praise her;

h. Mr. McDowell yelled out into the middle of the office. "I wish I had 10 Kayla's and **ZERO** JoAnn's" for everyone to hear;

i. Plaintiff was threatened and sexual harassed by male workers;

j. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

k. Mr. McDowell only allowed the young CSR females staff to train new hires. He refuses to allow Plaintiff or Sue Cole (who was 60 years old), also a CSR, to train new employees because Ms. Cole said, he believes older women are too old and stupid to train anyone;

l. Plaintiff was denied to return to work on "light duty" and accommodations after breaking her ankle. **However**, Ms. Jesser, was allowed accommodations and, as a result, she received her full pay (100% pay plus commission) when Plaintiff was forced to be on disability at a reduced pay for STD;

m. Older women like Plaintiff were disparaged by management;

n. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

o. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

p. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her;

q. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a result, Plaintiff had to take medical leave;

r. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in

two panic attacks that required medical treatment and leave to recover;

s. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

151. Sue Cole, another older worker, experienced disparate treatment as a result of her age. Ms. Cole admitted she was a former victim of management's age discrimination before Ms. Matos was hired.

152. Mr. McDowell has a known history of discriminating against older female workers.

153. Defendants' conduct, by and through its agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan at Defendants, in treating the Plaintiff in a manner unequal to other younger employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the ADEA.

154. On December 2, 2022, Sean McDowell directly asked Plaintiff her age. He admitted, **I shouldn't be asking you this, but, how old are you?"** When Plaintiff disclosed she was 60 years old, Mr. McDowell was dumbfounded and shook his head in disbelief. Then, Mr. McDowell said, **"You don't look 60 years old. I would've never have thought you were that OLD. Wow…"**

155. After Plaintiff told Mr. McDowell she was 60, it was office news. Plaintiff heard Mr. McDowell asking Ms. Nolan, "Did you know JoAnn is 60 years old?"

156. As a result, Plaintiff was ignored by the managers, denied proper training, avoided by staff, treated poorly by everyone on the office and discriminated against, because she told Mr. McDowell her age.

157. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's age.

158. As a result of Defendants' conduct and abuse, Plaintiff experienced TWO panic attacks in the span of 10 days. The last panic attack forcing her to take medical leave.

159. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TWO: AGE DISCRIMINATION UNDER CFEPA**

160. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 159, as if fully set forth herein.

161. Plaintiff was at all relevant times a highly qualified and competent employee of Defendants, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereafter, "CFEPA").

162. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her age.

163. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

    a. When Plaintiff first applied and interviewed for a Sales Coordinator position in sales, she did not get that position. This job was given to a substantially younger and substantially less experienced 19 year old CSR;

    b. Upon finding out Plaintiff's age, Culligan's attitude toward Plaintiff had

change completely and took a turn where she was ignored by managers, denied proper training, avoided by staff, denied job opportunities and benefits, treated poorly by everyone on the office, and discriminated against, because Plaintiff told Mr. McDowell her age;

c. Kayla Jesser, who was significantly younger, received exceptional training and motivational support by the same managers that mistreated Plaintiff because of her age;

d. Ms. Jesser was included in everything that the managers were working on which gave her a clear advantage over Plaintiff. This made her more knowledgeable about Culligan's policies, products, employee benefits, and all business practices;

e. Plaintiff would be ignored by Jim Nolan, the Service manager and Ms. Nolan's husband, negatively affecting Plaintiff's ability to get assistance with customers on the phone who have problems with the service department portion of her job. Ms. Jesser was not treated the same way;

f. Ms. Nolan and Mr. McDowell were always screaming at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like Plaintiff was a child;

g. When Plaintiff would take on the added task of translating for Spanish and Portuguese customers, Plaintiff was mocked by Mr. McDowell, but when Ms. Jesser attempted to speak Spanish, he would praise her;

h. Mr. McDowell yelled out into the middle of the office. "I wish I had 10 Kayla's and **ZERO** JoAnn's" for everyone to hear;

i. Plaintiff was threatened and sexual harassed by male workers;

j. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

k. Mr. McDowell only allowed the young CSR females staff to train new hires. He refuses to allow Plaintiff or Sue Cole (who was 60 years old), also a CSR, to train new employees because Ms. Cole said, he believes older women are too old and stupid to train anyone;

l. Plaintiff was denied to return to work on "light duty" and accommodations after breaking her ankle. **However**, Ms. Jesser, was allowed accommodations and, as a result, she received her full pay (100% pay plus commission) when Plaintiff was forced to be on disability at a reduced pay for STD;

m. Older women like Plaintiff were disparaged by management;

n. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

o. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

p. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her;

q. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a result, Plaintiff had to take medical leave;

r. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover;

s. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

164. Sue Cole, another older worker, experienced disparate treatment as a result of her age. Ms. Cole admitted she was a former victim of management's age discrimination before Plaintiff was hired.

165. Mr. McDowell has a known history of discriminating against older female workers.

166. Defendants' conduct, by and through its agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan at Defendants, in treating the Plaintiff in a manner unequal to other younger employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of age in violation of the ADEA.

167. On December 2, 2022, Sean McDowell directly asked Plaintiff her age. He admitted, **I shouldn't be asking you this, but, how old are you?"** When Plaintiff disclosed she was 60 years old, Mr. McDowell was dumbfounded and shook his head in disbelief. Then, Mr. McDowell said, **"You don't look 60 years old. I would've never have thought you were that OLD. Wow…"**

168. After Plaintiff told Mr. McDowell she was 60, it was office news. Plaintiff heard Mr. McDowell asking Ms. Nolan, "Did you know JoAnn is 60 years old?"

169. As a result, Plaintiff was ignored by the managers, denied proper training, avoided by staff, treated poorly by everyone on the office and discriminated against, because she told Mr. McDowell her age.

170. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's age.

171. As a result of Defendants' conduct and abuse, Plaintiff experienced TWO panic attacks in the span of 10 days. The last panic attack forcing her to take medical leave.

172. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT THREE: SEX DISCRIMINATION IN VIOLATION OF TITLE VII**

173. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 172, as if fully set forth herein.

174. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her sex, which is female.

175. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

a. Plaintiff had to endure sexual harassment from management and another male worker;

b. Mr. McDowell, in front of two other male managers, made a sexual comment directed at Plaintiff saying "This is the size softener you can fit in that area in

your home, do you think ***this size will satisfy you***?" putting the emphasis on the word, "**satisfy**." Mr. McDowell said it in a very suggestive voice making the two men in his office burst out laughing;

c. Mr. McDowell would make inappropriate sexual comments about Plaintiff's weight and size, and her appearance, and make several slurs towards her. No other worker experienced this abuse. Mr. McDowell consistently mocked Plaintiff, discrediting her accomplishments, and speaking to her in derogatory fashion in front of others, which encouraged them to treat her the same way;

d. Ms. Nolan and Mr. McDowell screamed at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like she was a child;

e. Plaintiff experienced sexual harassment perpetrated by Edgar Muy. His abuse of Plaintiff was known by many in the office. Mr. Muy would moan and sexually harass Plaintiff saying: **"I want to kiss you, I want to meet you after work, I want to eat you (sexually). I am going to eat this Puerto Rican before I leave Culligan."** Despite complaints made by Plaintiff, management did nothing. Instead, they minimized and ignored them, and allowed the sexual harassment to continue;

f. Plaintiff had to ask two service men, Alton Moore and George Allen, to keep Mr. Muy away from her to avoid being sexually harassed during an office Christmas party. Plaintiff left the Christmas party when Mr. Muy turned his back to avoid him following her;

g. Mr. McDowell would say in front of women in the office, **"I am so fat in the mornings when I wake up; I have trouble slipping into my Latex suit."**

Upon information and belief he was describing fitting into a condom. The only other thought would be a sleazy rubber body-suit. It was extremely uncomfortable and an inappropriate comment made by a male manager in the office in front of women;

h. Mr. McDowell also said out loud in the office, **"Do you know why it's good to date a homeless woman?** His punch line: **"Because after you are done with her, you can drop them off anywhere"**;

i. Male workers would threaten and harass Plaintiff saying, **"you don't want to mess with me"** and **"I am not anyone you want to mess with"** when she would try to defend herself;

j. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

k. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

l. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

m. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her;

n. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a result, Plaintiff had to take medical leave;

o. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover;

p. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

176. Sue Cole, another older female worker, experienced disparate treatment as a result of her sex and age. Ms. Cole admitted she was a former victim of management's age and sex discrimination before Plaintiff was hired.

177. Mr. McDowell has a known history of discriminating against older female workers.

178. Defendant's conduct, by and through its agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan at Defendants, in treating the Plaintiff in a manner unequal to other male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq*.

179. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

180. As a result of Defendants' conduct and abuse, Plaintiff experienced TWO panic attacks in the span of 10 days. The last panic attack forcing her to take medical leave.

181. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost

employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT FOUR: SEX DISCRIMINATION UNDER CFEPA**

182. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 181, as if fully set forth herein.

183. Plaintiff was at all relevant times a highly qualified and competent employee of Defendants, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereafter, "CFEPA").

184. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her sex, which is female.

185. Plaintiff was repeatedly treated differently than her similarly situated younger coworkers including but not limited to:

   a. Plaintiff had to endure sexual harassment from management and another male worker;

   b. Mr. McDowell, in front of two other male managers, made a sexual comment directed at Plaintiff saying "This is the size softener you can fit in that area in your home, do you think ***this size will satisfy you***?" putting the emphasis on the word, "**satisfy**." Mr. McDowell said it in a very suggestive voice making the two men in his office burst out laughing;

   c. Mr. McDowell would make inappropriate sexual comments about Plaintiff's weight and size, and her appearance, and make several slurs towards her. No other worker experienced this abuse. Mr. McDowell consistently mocked

Plaintiff, discrediting her accomplishments, and speaking to her in derogatory fashion in front of others, which encouraged them to treat her the same way. Mr. McDowell would subject Plaintiff to several slurs and sexual comments, including but not limited to, saying "Are you putting on weight?" after he looked Plaintiff up and down and checked out her body, comment about the size of Plaintiff's breasts, and comment about Plaintiff's hair;

d. Ms. Nolan and Mr. McDowell screamed at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like she was a child;

e. Plaintiff experienced sexual harassment perpetrated by Edgar Muy. His abuse of Plaintiff was known by many in the office. Mr. Muy would moan and sexually harass Plaintiff saying: **"I want to kiss you, I want to meet you after work, I want to eat you (sexually). I am going to eat this Puerto Rican before I leave Culligan."** Despite complaints made by Plaintiff, management did nothing. Instead, they minimized and ignored them, and allowed the sexual harassment to continue;

f. Plaintiff had to ask two service men, Alton Moore and George Allen, to keep Mr. Muy away from her to avoid being sexually harassed during an office Christmas party. Plaintiff left the Christmas party when Mr. Muy turned his back to avoid him following her;

g. Mr. McDowell would say in front of women in the office, **"I am so fat in the mornings when I wake up; I have trouble slipping into my Latex suit."** Upon information and belief he was describing fitting into a condom. The only other thought would be a sleazy rubber body-suit. It was extremely

uncomfortable and an inappropriate comment made by a male manager in the office in front of women;

h. Mr. McDowell also said out loud in the office, **"Do you know why it's good to date a homeless woman?** His punch line: **"Because after you are done with her, you can drop them off anywhere"**;

i. Male workers would threaten and harass Plaintiff saying, **"you don't want to mess with me"** and **"I am not anyone you want to mess with"** when she would try to defend herself;

j. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

k. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

l. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

m. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her

n. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a result, Plaintiff had to take medical leave;

o. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due

to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover;

p. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

186. Sue Cole, another older worker, experienced disparate treatment as a result of her sex and age. Ms. Cole admitted she was a former victim of management's age and sex discrimination before Plaintiff was hired.

187. Mr. McDowell has a known history of discriminating against older female workers.

188. Defendants' conduct, by and through its agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan at Defendants, in treating the Plaintiff in a manner unequal to other male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex in violation of CFEPA.

189. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

190. As a result of Defendants' conduct and abuse, Plaintiff experienced TWO panic attacks in the span of 10 days. The last panic attack forcing her to take medical leave.

191. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT FIVE: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

192. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 191, as if fully set forth herein.

193. Plaintiff is and was regarded as being disabled by Defendants.

194. Defendants are covered by the ADA and is subject to its mandates.

195. At all relevant times Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

196. Plaintiff suffered adverse employment action because of her disability or perceived disability including termination and disparate treatment.

197. After an altercation on January 3, 2025 and Mr. McDowell's history of similar attacks against Plaintiff for the duration of her employment with Culligan, Plaintiff experienced her first panic attack. Plaintiff was shaking and having difficulty breathing. Plaintiff went back to her desk and suffered a hypertensive panic attack while she wrote an email to Ms. Nolan saying Mr. McDowell treats Plaintiff unfairly. Plaintiff could not breathe, she was trembling out of control, she had sharp shooting spasms in her upper spine, and she got weak and almost collapsed to the floor of the office. Plaintiff was in a small office cubicle so the managers saw that she was shaking, crying, and short of breath. **No one helped Plaintiff.**.

198. Plaintiff texted Ms. Nolan on January 9, 2025 to **request accommodations** for her return to work on January 10, 2025 **as a result of her medical conditions** so that she could continue working.

199. On Friday, January 10, 2025, Plaintiff returned to work with the ER note and a letter from her doctors. That day, Plaintiff emailed Ms. Nolan two pages of documents. One

was a discharge form from the ER that stated that Plaintiff was seen at the ER on January 3, 2025 and she was to be out of work until she saw her PCP and Workers' Compensation orthopedic physician. The second was a "Certification to Return to School/Work" form from her PCP that informed Ms. Nolan that Plaintiff was seen on January 6, 2025 and that she was to remain out of work from January 6, 2025 to January 9, 2025. To be kept out of work by the ER for an undetermined time indicated the severity of her medical condition. She had both doctors' notes, but Plaintiff feared that they would retaliate against her again knowing her conditions.

200. Later, on January 13, 2025, around 1:40 pm, Plaintiff was ambushed again and told to report to Mr. McDowell's office without warning, despite her doctors' and an ER note, with Ms. Nolan standing pacing back and forth telling her to put her phone on DND and report to Mr. McDowell's office suddenly. Plaintiff was sick, and Plaintiff told her, "I can't I am shaking." Plaintiff's heart was racing and she was short of breath. She stood over Plaintiff and paced back to Mr. McDowell's office saying, "she's not getting up" and "she is not coming." Plaintiff asked her, "Please Danielle, I can't go in there, I am shaking and having a panic attack." All this while Plaintiff had given her a written note from her doctor and the ER doctor stating that Plaintiff had a **<u>hypertensive panic attack 10 days earlier</u>**.

201. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

202. The adverse employment actions taken against the Plaintiff as described herein above

were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, based on Plaintiff's disability and perceived disability.

203. Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disability and perceived disability.

204. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT SIX: DISABILITY DISCRIMINATION IN VIOLATION OF THE CFEPA**

205. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 204, as if fully set forth herein.

206. Plaintiff is and was regarded as being disabled by Defendants.

207. Defendants are covered by the CFEPA and are subject to its mandates.

208. At all relevant times Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

209. Plaintiff suffered adverse employment action because of her disability or perceived disability including termination and disparate treatment.

210. After an altercation on January 3, 2025 and Mr. McDowell's history of similar attacks against Plaintiff for the duration of her employment with Culligan, Plaintiff experienced her first panic attack. Plaintiff was shaking and having difficulty breathing. Plaintiff went back to her desk and suffered a hypertensive panic attack while she wrote an email to Ms.

Nolan saying Mr. McDowell treats Plaintiff unfairly. Plaintiff could not breathe, she was trembling out of control, she had sharp shooting spasms in her upper spine, and she got weak and almost collapsed to the floor of the office. Plaintiff was in a small office cubicle so the managers saw that she was shaking, crying, and short of breath. **No one helped Plaintiff.**.

211. Plaintiff texted Ms. Nolan on January 9, 2025 to **request accommodations** for her return to work on January 10, 2025 **as a result of her medical conditions** so that she could continue working.

212. On Friday, January 10, 2025, Plaintiff returned to work with the ER note and a letter from her doctors. That day, Plaintiff emailed Ms. Nolan two pages of documents. One was a discharge form from the ER that stated that Plaintiff was seen at the ER on January 3, 2025 and she was to be out of work until she saw her PCP and Workers' Compensation orthopedic physician. The second was a "Certification to Return to School/Work" form from her PCP that informed Ms. Nolan that Plaintiff was seen on January 6, 2025 and that she was to remain out of work from January 6, 2025 to January 9, 2025. To be kept out of work by the ER for an undetermined time indicated the severity of her medical condition. She had both doctors' notes, but Plaintiff feared that they would retaliate against her again knowing her conditions.

213. Later, on January 13, 2025, around 1:40 pm, Plaintiff was ambushed again and told to report to Mr. McDowell's office without warning, despite her doctors' and an ER note, with Ms. Nolan standing pacing back and forth telling her to put her phone on DND and report to Mr. McDowell's office suddenly. Plaintiff was sick, and Plaintiff told her, "I can't I am shaking." Plaintiff's heart was racing and she was short of breath. She stood

over Plaintiff and paced back to Mr. McDowell's office saying, "she's not getting up" and "she is not coming." Plaintiff asked her, "Please Danielle, I can't go in there, I am shaking and having a panic attack." All this while Plaintiff had given her a written note from her doctor and the ER doctor stating that Plaintiff had a **hypertensive panic attack 10 days earlier**.

214. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

215. The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of Defendants, by and through its employees, based on Plaintiff's disability and perceived disability.

216. Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disability and perceived disability.

217. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT SEVEN: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA FOR FAILURE TO ACCOMMODATE**

218. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 217, as if fully set forth herein.

219. Plaintiff is a person with a disability under the ADA in that she has a record of disabilities and suffers from panic attacks, which substantially limit one or more of her major life activities. Further, Plaintiff was regarded as being disabled by Defendants as demonstrated by record of correspondences between the Plaintiff and Defendants and Plaintiff's record of disabilities.

220. Defendants are covered by the ADA and is subject to its mandates.

221. At all relevant times the Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

222. Plaintiff texted Ms. Nolan on January 9, 2025 to <u>**request accommodations**</u> for her return to work on January 10, 2025 <u>**as a result of her medical conditions**</u> so that she could continue working: "Danielle, I will be in work tomorrow morning at my desk. I won't be able to take my medication because it makes me drowsy. If Shawn would like to talk to me at any point in time of the day, please have him email me. Until my blood pressure is under control, I want minimal exposure to the toxic environment that continues to affect my health. None of the issues I have brought forward to management have ever been resolved in that office. I am seeking relief from the abuse. I am still under my Doctors supervision. Please do not call me into any surprise ambushes from Shawn or anyone else as I don't believe I will be able to physically absorb it at this time. I request an HR advocate every time I get called into the office and if that's not possible then just email me and I'll be happy to continue to do my job as I was hired to do, but the rest of the stuff has nothing to do with me and I'm not going to quit my job so the pressure can just stop because I'm not going anywhere. I am available by email." Defendants failed to

participate in the interactive process and the retaliation and discrimination only continued and escalated further as evidenced by the events on January 13, 2025.

223. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

224. Plaintiff was discriminated against in the terms, privileges, and conditions of her employment by Defendants in that she was denied reasonable workplace accommodations for her disabilities.

225. Defendants knew of Plaintiff's disability and her need for accommodations but refused to provide said accommodations. Instead, Plaintiff was disciplined.

226. Defendants failed to engage in an interactive process with Plaintiff following her request for accommodations.

227. The adverse employment action taken against Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, based on Plaintiff's disabilities and request for accommodations.

228. Defendants cannot provide a legitimate, non-discriminatory reason for these adverse action taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disabilities and request for accommodations.

229. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to

incur attorney's fees, expenses, and costs.

**COUNT EIGHT: DISABILITY DISCRIMINATION IN VIOLATION OF THE CFEPA FOR FAILURE TO ACCOMMODATE**

230. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 229, as if fully set forth herein.

231. Plaintiff is a person with a disability under the CFEPA in that he has a record of disability and suffers from panic attacks, which substantially limit one or more of her major life activities. Further, Plaintiff was regarded as being disabled by Defendants as demonstrated by record of correspondences between the Plaintiff and Defendants and Plaintiff's record of disability.

232. Defendants are covered by the CFEPA and is subject to its mandates.

233. At all relevant times the Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

234. Plaintiff texted Ms. Nolan on January 9, 2025 to **request accommodations** for her return to work on January 10, 2025 **as a result of her medical conditions** so that she could continue working: "Danielle, I will be in work tomorrow morning at my desk. I won't be able to take my medication because it makes me drowsy. If Shawn would like to talk to me at any point in time of the day, please have him email me. Until my blood pressure is under control, I want minimal exposure to the toxic environment that continues to affect my health. None of the issues I have brought forward to management have ever been resolved in that office. I am seeking relief from the abuse. I am still under my Doctors supervision. Please do not call me into any surprise ambushes from Shawn or anyone else as I don't believe I will be able to physically absorb it at this time. I request an HR advocate every time I get called into the office and if that's not possible then just email

me and I'll be happy to continue to do my job as I was hired to do, but the rest of the stuff has nothing to do with me and I'm not going to quit my job so the pressure can just stop because I'm not going anywhere. I am available by email." Defendants failed to participate in the interactive process and the retaliation and discrimination only continued and escalated further as evidenced by the events on January 13, 2025.

235. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

236. Plaintiff was discriminated against in the terms, privileges, and conditions of her employment by Defendants in that she was denied reasonable workplace accommodations for her disabilities.

237. Defendants knew of Plaintiff's disability and her need for accommodations but refused to provide said accommodations. Instead, Plaintiff was disciplined.

238. Defendants failed to engage in an interactive process with Plaintiff following her request for accommodations.

239. The adverse employment action taken against Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, based on Plaintiff's disabilities and request for accommodations.

240. Defendants cannot provide a legitimate, non-discriminatory reason for these adverse action taken against the Plaintiff. Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disabilities and request for accommodations.

241. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT NINE: RACE DISCRIMINATION UNDER 42 U.S.C. § 1981**

242. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 241, as if fully set forth herein.

243. Defendants have unlawfully and willfully discriminated against Plaintiff because of her race as set forth above with regard to the terms, conditions and opportunities of her employment in violation of 42 U.S.C. § 1981.

244. Defendants have unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of 42 U.S.C. § 1981 as it took adverse actions as set forth above against the Plaintiff, who is Hispanic/Puerto Rican, who was qualified for her position and has been performing in exemplary fashion.

245. Defendants' willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

246. As a result of Defendants' unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TEN: RACE DISCRIMINATION UNDER TITLE VII**

247. Plaintiff repeats the allegations of Paragraphs 1 through 246, as if fully set forth herein.

248. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her race, which is Hispanic/Puerto Rican.

249. Plaintiff was repeatedly treated differently than her similarly situated non-Hispanic coworkers including but not limited to:

a. In comparison to Kayla Jesser, who is Caucasian and another CSR hired around the same time as Plaintiff, Plaintiff has been ignored by managers, denied proper training, avoided by staff, denied job opportunities and benefits, treated poorly by everyone on the office, and discriminated against, because of her race;

b. Plaintiff would be ignored by Jim Nolan, the Service manager and Ms. Nolan's husband, negatively affecting Plaintiff's ability to get assistance with customers on the phone who have problems with the service department portion of her job. Ms. Jesser was not treated the same way;

c. Ms. Nolan and Mr. McDowell were always screaming at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like Plaintiff was a child;

d. When Plaintiff would take on the added task of translating for Spanish and Portuguese customers, Plaintiff was mocked by Mr. McDowell, but when Ms. Jesser attempted to speak Spanish, he would praise her;

e. Mr. McDowell yelled out into the middle of the office. "I wish I had 10 Kayla's and **<u>ZERO</u>** JoAnn's" for everyone to hear;

f. Plaintiff was threatened and sexual harassed by male workers;

g. When Mr. McDowell asked Plaintiff about her race, he began making several slurs and sexual comments about her physical body, including but not limited to, being told, "You belong in a jungle," "are you putting on weight?" after he looking Plaintiff up and down to look at her body, and "why is your hair so frizzy, it's frizzy as hell" (as a Hispanic woman, Plaintiff's hair can be frizzy but comments about her appearance were unnecessary);

h. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

i. Plaintiff was denied to return to work on "light duty" and accommodations after breaking her ankle. **However**, Ms. Jesser, was allowed accommodations and, as a result, she received her full pay (100% pay plus commission) when Plaintiff was forced to be on disability at a reduced pay for STD;

j. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

k. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

l. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her;

m. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a result, Plaintiff had to take medical leave;

n. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover;

o. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

250. Defendants' willful and premeditated conduct, by and through its agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan at Defendant, in treating the Plaintiff in a manner unequal to other non-Hispanic employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of Title VII.

251. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

252. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT ELEVEN: RACE DISCRIMINATION UNDER CFEPA**

253. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 252, as if fully set forth herein.

254. Plaintiff was at all relevant times a highly qualified and competent employee of Defendants, and a covered person pursuant to the Connecticut Fair Employment Practices

Act (hereafter, "CFEPA").

255. Throughout her employment with Defendants, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of his race, which is Hispanic/Puerto Rican.

256. Plaintiff was repeatedly treated differently than her similarly situated non-Hispanic coworkers including but not limited to:

a. In comparison to Kayla Jesser, who is Caucasian and another CSR hired around the same time as Plaintiff, Plaintiff has been ignored by managers, denied proper training, avoided by staff, denied job opportunities and benefits, treated poorly by everyone on the office, and discriminated against, because of her race;

b. Plaintiff would be ignored by Jim Nolan, the Service manager and Ms. Nolan's husband, negatively affecting Plaintiff's ability to get assistance with customers on the phone who have problems with the service department portion of her job. Ms. Jesser was not treated the same way;

c. Ms. Nolan and Mr. McDowell were always screaming at Plaintiff in front of others telling her to "shut up" and "don't you ever do that again!" like Plaintiff was a child;

d. When Plaintiff would take on the added task of translating for Spanish and Portuguese customers, Plaintiff was mocked by Mr. McDowell, but when Ms. Jesser attempted to speak Spanish, he would praise her;

e. Mr. McDowell yelled out into the middle of the office. "I wish I had 10 Kayla's and **ZERO** JoAnn's" for everyone to hear;

f. Plaintiff was threatened and sexual harassed by male workers;

g. When Mr. McDowell asked Plaintiff about her race, he began making several slurs and sexual comments about her physical body, including but not limited to, being told, "You belong in a jungle," "are you putting on weight?" after he looking Plaintiff up and down to look at her body, and "why is your hair so frizzy, it's frizzy as hell" (as a Hispanic woman, Plaintiff's hair can be frizzy but comments about her appearance were unnecessary);

h. Plaintiff was set up to fail and not given key information to do her job then blamed for any alleged mistakes;

i. Plaintiff was denied to return to work on "light duty" and accommodations after breaking her ankle. <u>**However**</u>, Ms. Jesser, was allowed accommodations and, as a result, she received her full pay (100% pay plus commission) when Plaintiff was forced to be on disability at a reduced pay for STD;

j. Management and Human Resources would ambush Plaintiff with an impromptu meeting, then victim shame and force her to defend her complaints when the same managers she complained about were in the same room;

k. Mr. McDowell almost hit Plaintiff in the back of the head in her cubicle with the large sales file box full of files;

l. Plaintiff would be verbally attacked by Mr. McDowell causing Plaintiff to experience a panic attack and even after reporting her symptoms, no one helped her;

m. Plaintiff would be ambushed and unfairly disciplined just 10 days after she had a hypertensive panic attack, causing her to have another panic attack. As a

result, Plaintiff had to take medical leave;

n. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover;

o. Plaintiff was qualified for her position and that she suffered an adverse employment action when she was willfully discriminated against and unlawfully disciplined.

257. Defendants' conduct, by and through their agents and employees, including without limitation Shawn McDowell, Danielle Nolan, Ashley Floyd, Wendy Osborne, and Jim Nolan, in treating the Plaintiff in a manner unequal to other employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race in violation of the CFEPA.

258. The discriminatory acts of Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's race.

259. As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TWELVE: RETALIATION DISCRIMINATION IN VIOLATION OF THE ADEA**

260. Plaintiff repeats the allegations of Paragraphs 1 through 259, as if fully set forth herein.

261. Plaintiff asserts a claim for intentional and willful retaliation pursuant to the ADEA for reporting complaints of discrimination.

262. In mid-March of 2023, Plaintiff met with Mr. McDowell in his office and told him that Ms. Jesser (younger and Caucasian) clearly was receiving training and support that she was not getting. Plaintiff reported how Jim Nolan and Danielle Nolan speak to Ms. Jesser as if they have known her for 30 years, yet neither will speak to Plaintiff or assist her like they help Ms. Jesser. Mr. McDowell attempted to discredit Plaintiff and ignored her complaints. Nothing changed and the mistreatment of Plaintiff continued.

263. Subsequently, Plaintiff continued to send several complaint emails to Mr. McDowell and Ms. Nolan. Nothing was done to help Plaintiff. Instead, managers ignored her complaints of bias and discrimination and retaliated against her by making false accusations towards her that were other employees' errors.

264. On August 23, 2023 after over eight months of relentless discrimination and targeting, and horrible abuse, Plaintiff wrote an email to HR (Ashley Floyd, HR manager) asking for relief of the abuse and reported her concerns. In her complaint, Plaintiff reported details of the hostile and discriminatory work environment Plaintiff was made to endure. Plaintiff specifically pointed to ageism and preferential treatment towards her younger co-worker, Kayla Jesser by the Company. Plaintiff made it clear that she made several attempts to report and address these issues with management. The frustration left her in tears at her home because Plaintiff could not stomach returning to work and being subjected to such a horrific environment.

265. On August 24, 2023, Plaintiff's car was hit and/or vandalized when she returned to work one day after sending the HR Complaint.

266. In September of 2023, Plaintiff was not informed of a meeting with HR and she was caught off guard, which has always been their method of attack. After management

reviewed her HR Complaint, Plaintiff was abruptly called into an ambush meeting by 4 managers: Ms. Nolan, Mr. McDowell, Wendy Osborne (Regional Manager), and Ashley Floyd (former HR manager). This was extremely inappropriate as her complaints were primarily about Mr. McDowell and Ms. Nolan. In the same meeting, Plaintiff also told Wendy Osborne and Ashley Floyd that she was being called a "Nigger" every morning by a service man and that Plaintiff was threatened by two male employees. Plaintiff was also harassed by Mr. McDowell and Ms. Nolan, and that Jim Nolan hasn't spoken to her for almost 8 months at that time. Ms. Osborne and Ms. Floyd told Plaintiff they would follow up with her, but they never did. Plaintiff was forced to finish her job that day alone in the office and her schedules were not done all because of this "surprise attack" meeting. These corporate managers did not assist Plaintiff but instead retaliated against her for reporting the Danbury managers. They were in complete attack mode and defended the managers, but when they heard that Plaintiff was called a "Nigger" and who did it, they shut down the meeting. Ultimately, nothing was done and Plaintiff continued to experience discrimination and retaliation.

267. On October 22, 2024, Plaintiff again reported her complaints of discrimination to Mr. McDowell.

268. On October 31, 2024, Plaintiff was injured at work and Mr. McDowell was notified of the incident. However, Defendants refused to file an incident report.

269. On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't

care." Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" Mr. McDowell would yell and intimidate Plaintiff. Due to this altercation and Mr. McDowell's history of attacks, Plaintiff suffered her first panic attack. Prior to leaving work to go to the ER, Plaintiff reported Mr. McDowell's discriminatory treatment to Ms. Nolan via email.

270. Then, on January 10, 2025, the day Plaintiff returned to work following her first panic attack, Mr. McDowell allowed another employee to interrogate Plaintiff about actions he approved.

271. On January 13, 2025, Plaintiff was ambushed again and given a "written warning" for her involvement with the co-worker on January 10, 2025 who twisted the incident to make Plaintiff the instigator. As a result, Plaintiff experienced her second panic attack and took medical leave.

272. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

273. Defendants intentionally and willfully retaliated against Plaintiff for reporting her complaints of discrimination.

274. Defendants must be held liable on this Count.

**COUNT THIRTEEN: RETALIATION DISCRIMINATION IN VIOLATION OF THE ADA**

275. Plaintiff repeats the allegations of Paragraphs 1 through 274, as if fully set forth herein.

276. Plaintiff asserts a claim for intentional and willful retaliation pursuant to the ADA for reporting complaints of discrimination.

277. On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't care." Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" Mr. McDowell would yell and intimidate Plaintiff. Due to this altercation and Mr. McDowell's history of attacks, Plaintiff suffered her first panic attack. Prior to leaving work to go to the ER, Plaintiff reported Mr. McDowell's discriminatory treatment to Ms. Nolan via email.

278. On January 9, 2025, Plaintiff contacted Ms. Nolan to **request accommodations** for her return to work on January 10, 2025 **as a result of her medical conditions** so that she could continue working. Culligan failed to participate in the interactive process and the retaliation and discrimination only continued and escalated further as evidenced by the events on January 13, 2025. Instead, they would discipline Plaintiff.

279. On Friday, January 10, 2025, Plaintiff returned to work with the ER note and a letter from her doctors. That day, Plaintiff emailed Ms. Nolan two pages of documents. One was a discharge form from the ER that stated that Plaintiff was seen at the ER on January 3, 2025 and she was to be out of work until she saw her PCP and Workers' Compensation orthopedic physician. The second was a "Certification to Return to School/Work" form from her PCP that informed Ms. Nolan that Plaintiff was seen on January 6, 2025 and that she was to remain out of work from January 6, 2025 to January 9, 2025. Thus, Defendants were aware of Plaintiff's health conditions.

280. Then, on January 10, 2025, the day Plaintiff returned to work following her first panic attack, Mr. McDowell allowed another employee to interrogate Plaintiff about actions he approved.

281. On January 13, 2025, Plaintiff was ambushed again and given a "written warning" for her involvement with the co-worker on January 10, 2025 who twisted the incident to make Plaintiff the instigator. As a result, Plaintiff experienced her second panic attack and took medical leave.

282. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

283. Defendants intentionally and willfully retaliated against Plaintiff for reporting her complaints of discrimination.

284. Defendants must be held liable on this Count.

**COUNT FOURTEEN: RETALIATION DISCRIMINATION IN VIOLATION OF THE TITLE VII**

285. Plaintiff repeats the allegations of Paragraphs 1 through 284, as if fully set forth herein.

286. Plaintiff asserts a claim for intentional and willful retaliation pursuant to Title VII for reporting a complaint of discrimination.

287. During the year of 2023, Plaintiff told Ms. Nolan and Mr. McDowell reported Mr. Muy's sexual harassment as he was very inappropriate and disrespectful regarding how he spoke to her, but they disregarded Plaintiff's complaints.

288. Subsequently, Plaintiff continued to send several complaint emails to Mr. McDowell and Ms. Nolan. Nothing was done to help Plaintiff. Instead, managers ignored her complaints

of bias and discrimination and retaliated against her by making false accusations towards her that were other employees' errors.

289. On August 23, 2023 after over eight months of relentless discrimination and targeting, and horrible abuse, Plaintiff wrote an email to HR (Ashley Floyd, HR manager) asking for relief of the abuse and reported her concerns. In her complaint, Plaintiff reported details of the hostile and discriminatory work environment Plaintiff was made to endure. Plaintiff made it clear that she made several attempts to report and address these issues with management. The frustration left her in tears at her home because Plaintiff could not stomach returning to work and being subjected to such a horrific environment.

290. On August 24, 2023, Plaintiff's car was hit and/or vandalized when she returned to work one day after sending the HR Complaint.

291. In September of 2023, Plaintiff was not informed of a meeting with HR and she was caught off guard, which has always been their method of attack. After management reviewed her HR Complaint, Plaintiff was abruptly called into an ambush meeting by 4 managers: Ms. Nolan, Mr. McDowell, Wendy Osborne (Regional Manager), and Ashley Floyd (former HR manager). This was extremely inappropriate as her complaints were primarily about Mr. McDowell and Ms. Nolan. In the same meeting, Plaintiff also told Wendy Osborne and Ashley Floyd that she was being called a "Nigger" every morning by a service man and that Plaintiff was threatened by two male employees. Plaintiff was also harassed by Mr. McDowell and Ms. Nolan, and that Jim Nolan hasn't spoken to her for almost 8 months at that time. Ms. Osborne and Ms. Floyd told Plaintiff they would follow up with her, but they never did. Plaintiff was forced to finish her job that day alone in the office and her schedules were not done all because of this "surprise attack"

meeting. These corporate managers did not assist Plaintiff but instead retaliated against her for reporting the Danbury managers. They were in complete attack mode and defended the managers, but when they heard that Plaintiff was called a "Nigger" and who did it, they shut down the meeting. Ultimately, nothing was done and Plaintiff continued to experience discrimination and retaliation.

292. On October 22, 2024, Plaintiff again reported her complaints of discrimination to Mr. McDowell.

293. On October 31, 2024, Plaintiff was injured at work and Mr. McDowell was notified of the incident. However, Defendants refused to file an incident report.

294. On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't care." Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" Mr. McDowell would yell and intimidate Plaintiff. Due to this altercation and Mr. McDowell's history of attacks, Plaintiff suffered her first panic attack. Prior to leaving work to go to the ER, Plaintiff reported Mr. McDowell's discriminatory treatment to Ms. Nolan via email.

295. Then, on January 10, 2025, the day Plaintiff returned to work following her first panic attack, Mr. McDowell allowed another employee to interrogate Plaintiff about actions he approved.

296. On January 13, 2025, Plaintiff was ambushed again and given a "written warning" for her involvement with the co-worker on January 10, 2025 who twisted the incident to make

Plaintiff the instigator. As a result, Plaintiff experienced her second panic attack and took medical leave.

297. After Plaintiff left Culligan on leave on January 13, 2025, she wrote an incident report to Ms. Nolan stating that she failed to stop the sexual harassment that Plaintiff complained to her about.

298. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

299. Defendants intentionally and willfully retaliated against Plaintiff for reporting her complaints of discrimination.

300. Defendants should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

**COUNT FIFTEEN: RETALIATION DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

301. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 300, as if fully set forth herein.

302. In mid-March of 2023, Plaintiff met with Mr. McDowell in his office and told him that Ms. Jesser (younger and Caucasian) clearly was receiving training and support that she was not getting. Plaintiff reported how Jim Nolan and Danielle Nolan speak to Ms. Jesser as if they have known her for 30 years, yet neither will speak to Plaintiff or assist her like they help Ms. Jesser. Mr. McDowell attempted to discredit Plaintiff and ignored her complaints. Nothing changed and the mistreatment of Plaintiff continued.

303. Subsequently, Plaintiff continued to send several complaint emails to Mr. McDowell and

Ms. Nolan. Nothing was done to help Plaintiff. Instead, managers ignored her complaints of bias and discrimination and retaliated against her by making false accusations towards her that were other employees' errors.

304. On August 23, 2023 after over eight months of relentless discrimination and targeting, and horrible abuse, Plaintiff wrote an email to HR (Ashley Floyd, HR manager) asking for relief of the abuse and reported her concerns. In her complaint, Plaintiff reported details of the hostile and discriminatory work environment Plaintiff was made to endure. Plaintiff specifically pointed to ageism and preferential treatment towards her younger co-worker, Kayla Jesser by the Company. Plaintiff made it clear that she made several attempts to report and address these issues with management. The frustration left her in tears at her home because Plaintiff could not stomach returning to work and being subjected to such a horrific environment.

305. On August 24, 2023, Plaintiff's car was hit and/or vandalized when she returned to work one day after sending the HR Complaint.

306. In September of 2023, Plaintiff was not informed of a meeting with HR and she was caught off guard, which has always been their method of attack. After management reviewed her HR Complaint, Plaintiff was abruptly called into an ambush meeting by 4 managers: Ms. Nolan, Mr. McDowell, Wendy Osborne (Regional Manager), and Ashley Floyd (former HR manager). This was extremely inappropriate as her complaints were primarily about Mr. McDowell and Ms. Nolan. In the same meeting, Plaintiff also told Wendy Osborne and Ashley Floyd that she was being called a "Nigger" every morning by a service man and that Plaintiff was threatened by two male employees. Plaintiff was also harassed by Mr. McDowell and Ms. Nolan, and that Jim Nolan hasn't spoken to her

for almost 8 months at that time. Ms. Osborne and Ms. Floyd told Plaintiff they would follow up with her, but they never did. Plaintiff was forced to finish her job that day alone in the office and her schedules were not done all because of this "surprise attack" meeting. These corporate managers did not assist Plaintiff but instead retaliated against her for reporting the Danbury managers. They were in complete attack mode and defended the managers, but when they heard that Plaintiff was called a "Nigger" and who did it, they shut down the meeting. Ultimately, nothing was done and Plaintiff continued to experience discrimination and retaliation.

307. On October 22, 2024, Plaintiff again reported her complaints of discrimination to Mr. McDowell.

308. On October 31, 2024, Plaintiff was injured at work and Mr. McDowell was notified of the incident. However, Defendants refused to file an incident report.

309. On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't care." Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" Mr. McDowell would yell and intimidate Plaintiff. Due to this altercation and Mr. McDowell's history of attacks, Plaintiff suffered her first panic attack. Prior to leaving work to go to the ER, Plaintiff reported Mr. McDowell's discriminatory treatment to Ms. Nolan via email.

310. Then, on January 10, 2025, the day Plaintiff returned to work following her first panic attack, Mr. McDowell allowed another employee to interrogate Plaintiff about actions he approved.

311. On January 13, 2025, Plaintiff was ambushed again and given a "written warning" for her involvement with the co-worker on January 10, 2025 who twisted the incident to make Plaintiff the instigator. As a result, Plaintiff experienced her second panic attack and took medical leave.

312. After Plaintiff left Culligan on leave on January 13, 2025, she wrote an incident report to Ms. Nolan stating that she failed to stop the sexual harassment that Plaintiff complained to her about.

313. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

314. Defendants intentionally and willfully retaliated against Plaintiff for reporting his complaints of discrimination.

315. Defendants should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

**COUNT SIXTEEN: RETALIATION DISCRIMINATION IN VIOLATION OF CFEPA**

316. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 315, as if fully set forth herein.

317. In mid-March of 2023, Plaintiff met with Mr. McDowell in his office and told him that Ms. Jesser (younger and Caucasian) clearly was receiving training and support that she

was not getting. Plaintiff reported how Jim Nolan and Danielle Nolan speak to Ms. Jesser as if they have known her for 30 years, yet neither will speak to Plaintiff or assist her like they help Ms. Jesser. Mr. McDowell attempted to discredit Plaintiff and ignored her complaints. Nothing changed and the mistreatment of Plaintiff continued.

318. Subsequently, Plaintiff continued to send several complaint emails to Mr. McDowell and Ms. Nolan. Nothing was done to help Plaintiff. Instead, managers ignored her complaints of bias and discrimination and retaliated against her by making false accusations towards her that were other employees' errors.

319. On August 23, 2023 after over eight months of relentless discrimination and targeting, and horrible abuse, Plaintiff wrote an email to HR (Ashley Floyd, HR manager) asking for relief of the abuse and reported her concerns. In her complaint, Plaintiff reported details of the hostile and discriminatory work environment Plaintiff was made to endure. Plaintiff specifically pointed to ageism and preferential treatment towards her younger co-worker, Kayla Jesser by the Company. Plaintiff made it clear that she made several attempts to report and address these issues with management. The frustration left her in tears at her home because Plaintiff could not stomach returning to work and being subjected to such a horrific environment.

320. On August 24, 2023, Plaintiff's car was hit and/or vandalized when she returned to work one day after sending the HR Complaint.

321. In September of 2023, Plaintiff was not informed of a meeting with HR and she was caught off guard, which has always been their method of attack. After management reviewed her HR Complaint, Plaintiff was abruptly called into an ambush meeting by 4 managers: Ms. Nolan, Mr. McDowell, Wendy Osborne (Regional Manager), and Ashley

Floyd (former HR manager). This was extremely inappropriate as her complaints were primarily about Mr. McDowell and Ms. Nolan. In the same meeting, Plaintiff also told Wendy Osborne and Ashley Floyd that she was being called a "Nigger" every morning by a service man and that Plaintiff was threatened by two male employees. Plaintiff was also harassed by Mr. McDowell and Ms. Nolan, and that Jim Nolan hasn't spoken to her for almost 8 months at that time. Ms. Osborne and Ms. Floyd told Plaintiff they would follow up with her, but they never did. Plaintiff was forced to finish her job that day alone in the office and her schedules were not done all because of this "surprise attack" meeting. These corporate managers did not assist Plaintiff but instead retaliated against her for reporting the Danbury managers. They were in complete attack mode and defended the managers, but when they heard that Plaintiff was called a "Nigger" and who did it, they shut down the meeting. Ultimately, nothing was done and Plaintiff continued to experience discrimination and retaliation.

322. On October 22, 2024, Plaintiff again reported her complaints of discrimination to Mr. McDowell.

323. On October 31, 2024, Plaintiff was injured at work and Mr. McDowell was notified of the incident. However, Defendants refused to file an incident report.

324. On January 3, 2025, Plaintiff was working with a customer on the phone and spoke with Edgar Muy, the driver who had been making sexual advances towards Plaintiff. Mr. Muy hung up on Plaintiff and when she got off the phone Plaintiff told the managers that a customer was upset and when she called Mr. Muy he hung up on her saying, "I don't care." Mr. McDowell yelled out abruptly and ordered Plaintiff into his office without warning, screaming out Plaintiff's name, "JoAnn, get in here!" Mr. McDowell would yell

and intimidate Plaintiff. Due to this altercation and Mr. McDowell's history of attacks, Plaintiff suffered her first panic attack. Prior to leaving work to go to the ER, Plaintiff reported Mr. McDowell's discriminatory treatment to Ms. Nolan via email.

325. Then, on January 10, 2025, the day Plaintiff returned to work following her first panic attack, Mr. McDowell allowed another employee to interrogate Plaintiff about actions he approved.

326. On January 13, 2025, Plaintiff was ambushed again and given a "written warning" for her involvement with the co-worker on January 10, 2025 who twisted the incident to make Plaintiff the instigator. As a result, Plaintiff experienced her second panic attack and took medical leave.

327. Upon her return from leave, Plaintiff would be demoted and working remotely for less pay with Defendants as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

328. Defendants intentionally and willfully retaliated against Plaintiff for reporting his complaints of discrimination.

329. Defendants should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

**COUNT SEVENTEEN: FRAUDULENT MISREPRESENTATION AND INDUCEMENT**

330. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 329, as if fully set forth herein.

331. Defendants' actions as set forth above were committed knowingly and fraudulently in order to misrepresent to Plaintiff the terms, conditions, and benefits of her employment

with the Defendants.

332. Defendants made deliberately false statements to Plaintiff with the sole intention and purpose of inducing the Plaintiff to first join them.

333. The specific misrepresentations made by Defendants included statements by Defendants' management including General Manager, Shawn McDowell and Office Manager, Danielle Nolan. On or about November 8, 2022, Plaintiff met both Ms. Nolan and Mr. McDowell, who were not dressed professionally, at Culligan. Plaintiff was professionally dressed. Plaintiff noticed right away that the office was extremely dirty and dank looking. Plaintiff met with them for an hour and Plaintiff impressed them with her professionalism and her work experience. Plaintiff assured both managers during this interview that she would consider working as a CSR but that Plaintiff did not want to work with high volume telephone calls. They assured her that there was managerial support for dealing with customers on the phones. They assured Plaintiff that she would have full access to their offices close by and Plaintiff could walk in any time for assistance. The interview went very well and they were obviously impressed by Plaintiff. **Plaintiff asked the two managers directly if they practiced favoritism or bias in the office. Both, with eagerness to have her work for Culligan, praised their office environment and made it clear, "we do not practice favoritism or bias." Plaintiff made it clear that she did not want to work anywhere where bias was allowed.**

334. Defendants failed to disclose that Mr. McDowell had a known history of discriminating against older women.

335. Based on the representations of Defendants, she accepted the position as CSR.

336. Then upon joining, Plaintiff was completely ignored and pushed aside by management. Plaintiff was denied proper training, avoided by staff, denied job opportunities and benefits, treated poorly by everyone on the office, and discriminated against due to her protected classes. The two managers, Ms. Nolan and Mr. McDowell, clearly breached their verbal confirmation to Plaintiff about the preferential bias that they routinely practiced at Culligan in Danbury.

337. After starting work for Defendant, Plaintiff reminded Mr. McDowell of what he and Ms. Nolan told her before she was hired. Plaintiff said, **"you both told me that you did not practice preferential bias in this office."** Mr. McDowell seemed annoyed she remembered. Nothing changed. Plaintiff relied on their representations to her detriment. Despite her best efforts, Plaintiff could not find another opportunity outside of Defendants and was forced to endure the hostile and discriminatory work environment she was promised did not exist at Defendants. Now, she has been demoted and working remotely for less pay with Respondents as she cannot physically set foot in the office due to the constant discrimination and retaliation she experienced that resulted in two panic attacks that required medical treatment and leave to recover.

338. Defendants were aware that Plaintiff was relying on these misrepresentations when she accepted the terms of her employment.

339. Plaintiff justifiably relied on Defendants' promises as aforesaid.

340. As a result of the Defendants' fraudulent misrepresentations, Plaintiff has suffered harm, and continues to suffer harm.

341. If Plaintiff had known that Defendants did not intend to deal with integrity and good faith in performing its obligations and conduct its business in an ethical manner, Plaintiff never would have commenced her employment with Defendants.

342. The fraudulent misrepresentations of the Defendants caused the Plaintiff to suffer losses and damages as a result of lost wages, benefits, and incentives at another company which Plaintiff left to work at Defendants based on the fraudulent misrepresentations set forth above.

343. Further, the Plaintiff is entitled to punitive or exemplary damages pursuant to the common law for its willful and fraudulent misconduct as set forth herein above.

**COUNT EIGHTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

344. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 343, as if fully set forth herein.

345. The actions of Defendants as set forth above, including the acts of discrimination including without limitation being subjected unequal treatment, targeting and a sham discipline, lack of support, harassment, retaliation, and ultimately, demotion.

346. In taking the actions against Plaintiff as aforesaid, Defendants intended to inflict emotional distress, or it knew or should have known that emotional distress was the likely result of its conduct.

347. The conduct of Defendants in this case was extreme and outrageous and was the cause of Plaintiff's distress.

348. The emotional distress sustained by Plaintiff was severe.

349. As a direct result of Defendants' intentional actions, Plaintiff experienced tremendous anxiety and stress as a result of Defendants' discriminatory and retaliatory actions. The

mistreatment was so intense that she experienced two severe hypertensive panic attacks within days of each other. Both panic attacks required medical treatment and the last panic attack required her to take leave in order to treat and recover enough to return to work. Plaintiff has been so effected that she experienced another panic attack in the elevator at the New Milford town hall where her first Workers' Compensation hearing was going to take place due to the anxiety of seeing the two faces of the managers at Defendants who had mentally and emotionally abused her.

350. Defendants must be held liable on this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a) Award compensatory damages;

(b) Award punitive damages;

(c) Award attorneys' fees and costs;

(d) Award pre-judgement interest;

(e) Award post-judgement interest; and

(f) Award such other relief in law or equity as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by her Complaint.

Respectfully submitted,

PLAINTIFF
JOANNE MATOS

By: /s/ ____________________

Mark P. Carey (ct17828)
Genevieve M. Lage (ct30334)
Carey & Associates, P.C.
71 Old Post Road, Suite 1
Southport, CT 06890
(203) 255-4150 tel.
(203) 255-0380 fax
mcarey@capclaw.com
glage@capclaw.com
*Her Attorneys*

# **EXHIBIT A**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/23/2025

**To:** JoAnn Matos
31 Greenview road
New Milford, CT 06776

Charge No: 16A-2025-00787

EEOC Representative and email: DARLAN BASTIDAS
SUPERVISORY INVESTIGATOR
DARLAN.BASTIDAS@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
09/23/2025

Arlean Nieto
Acting District Director

**Cc:**
Irena Maier Esq.
Wilson Elser
1010 Washington Boulevard
Stamford, CT 06901

NA NA
28 Eagle Road
Danbury, CT 06810

Genevieve Lage
Carey & Associates
71 Old Post Road
Southport, CT 06890

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 16A-2025-00787 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 16A-2025-00787 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# EXHIBIT B

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

JoAnn Matos
**COMPLAINANT**

CHRO No. 2520345
EEOC No. 16A-2025-00787

vs.

Culligan Water Co.
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

Tanya A. Hughes

**DATE:** September 16, 2025

Tanya A. Hughes, Executive Director

Service:
**Complainant:** JoAnn Matos (joannmatos@att.net)
**Complainant's Attorney**: Genevieve Lage, Esq. (Via Email – glage@capclaw.com)
**Respondent:** Irena Maier, Esq. (irena.maier@wilsonelser.com)

.